Barth *v.* Philadelphia School District et al.,
Appellants.

Argued June 2, 1958. Before JONES, C. J., BELL,
MUSMANNO, ARNOLD, JONES and COHEN, JJ.

558

reargument refused August 15, 1958.

*C. Brewster Rhoads,* with him *Sidney L. Wickenhaver, Edward B. Soken,* and *Montgomery, McCracken, Walker & Rhoads,* for School District of Philadelphia, appellant.

*David Berger,* City Solicitor, with him *James L. Stern,* Deputy City Solicitor, and *Shirley Bitterman,* Assistant City Solicitor, for Youth Conservation Commission of Philadelphia, appellant.

*Marvin Comisky,* with him *Brumbelow & Comisky,* for appellee.

OPINION BY MR. JUSTICE BELL, July 25, 1958:

Plaintiff filed a complaint in equity in a taxpayers' suit on behalf of himself and all other taxpayers of the School District of Philadelphia. Plaintiff prayed for an injunction to restrain—not the City but—the School District of Philadelphia from making any expenditure or contribution of money, materials, services or facilities in performance of an Agreement entered into by the Board of Education of the School District of Philadelphia and the City of Philadelphia on or about February 14, 1958 to establish and pay for a Youth Conservation Commission. Defendants filed preliminary objections to the complaint; these objections were dis-

missed by the lower Court. From a final decree which granted an injunction, defendants took this appeal.

The Agreement establishes a Youth Conservation Commission of Philadelphia for the purpose of organizing, formulating, operating and financing a program to curb juvenile delinquency in Philadelphia. The Agreement pertinently provides, inter alia, that the Commission shall be composed of three members, one to be appointed by the City of Philadelphia; one to be a member of the Board of Public Education to be appointed by the Board's President; and the third to be appointed jointly by the Mayor and the President of the Board of Public Education. Each member of the Commission was to serve at the pleasure of his appointing authority. The Commission (a) was to be responsible for the formulation and the general management, direction and control of the program set forth in the Agreement, and (b) was given authority to employ an executive director and a staff, "which were not to be considered employees of either the School District or the City of Philadelphia."

The functions, purposes and program of the Commission were set forth in paragraph 3 of the Agreement. These authorized the Commission:

(a) To coordinate and assist in formulating the programs of all agencies in the City for the broad purpose of reducing juvenile delinquency and to adopt and carry out plans for that purpose.

(b) To propose educational courses and special training to meet individual needs and recreational programs and activities to be furnished by the School District and the City.

(c) To meet with problem youths and their parents and to recommend the professional counseling of problem youths and their parents.

(d)   To organize sensitive areas in the City on a block by block basis where other agencies are not effectively operating and to enlist volunteer workers to work with the local residents in an effort to improve living conditions, and also to serve as a warning source in the event any problems arise in the area involving juveniles.

(e)   To take any active part in gang control activities.

(f)   To receive from public and private sources of all kinds and to administer contributions of money and property for the foregoing purposes.

The Agreement also provided in paragraph 5 that . . . "the program of the Commission *shall be an independent undertaking and shall not be considered an integral part of the program of either the City or of the School District, nor subject to the requirements of either the Home Rule Charter or the Public School Code of 1949, as amended.*"

The Agreement authorized the payment by the School District for the calendar year 1958 of "amounts up to a total of $125,000 . . . In addition . . . the parties may make other facilities available to the Commission for its program without cost to the Commission".

The School District's budget for 1958 contained in Item 3 "Constructive citizenship . . . $125,000.00".

Various reasons, some of which will be hereinafter discussed, were advanced to support taxpayers' contention that this Agreement and the proposed appropriation of $125,000 (plus) for the first year were, as to the School District, ultra vires.

A program to study and curb juvenile delinquency is not only worthy, but highly desirable. The crime wave which is sweeping our Country, and particularly the rise and extent of juvenile delinquency, and the

vandalism and the atrocious crimes committed by juveniles * has astonished, troubled and appalled our entire nation. Law and order, prevention, suppression and punishment of crime, control of gangs, improvement of living conditions, rehabilitation of problem persons and persons with criminal tendencies—these are and since ancient times have been matters for the Sovereign (in our Country, local or State, and more recently, National Government), and have never heretofore been considered as a part of "Education". Furthermore a worthy objective does not justify the action of a School District or a public body, which has no fundamental or inherent powers of Government, unless that action is authorized by the Constitution or by an Act of the Legislature.

A School District is not a Constitutional body. The only constitutional provision with respect to Education is contained in Article X. of the Constitution of Pennsylvania. Article X. reads as follows:

"Education

"Public Schools Provided for.

"Section 1. *The General Assembly* shall provide for the maintenance and support of a thorough and efficient system of public schools, wherein all the children of the Commonwealth above the age of six years may be educated, and shall appropriate at least one million dollars each year for that purpose.

"Sectarian Schools Not to Receive Public School Money.

---

* According to the Committee of Seventy in their May, 1958 issue of Civic Affairs, 9027 young persons under the age of 18 years were arrested in Philadelphia by the police in 1957. 46 out of every 100 arrests made for major crimes in Philadelphia, according to the F.B.I. Classification of Major Crimes Offenses, were of young persons between the ages of 13 and 18 years. A major crime offense under the above mentioned classification meant murder, rape, robbery, burglary and auto theft.

"Section 2. No money raised for the support of the public schools of the Commonwealth shall be appropriated to or used for the support of any sectarian school.

"Females Eligible as School Officers.

"Section 3. Women twenty-one years of age and upwards shall be eligible to any office of control or management under the school laws of this State."

It is clear, we repeat, that a public school or a public school district is not a constitutional body.

A School District is a creature or agency of the Legislature and has only the powers that are granted by statute, specifically or by necessary implication: *Slippery Rock Area Joint School System v. Franklin Township S.D.*, 389 Pa. 435, 133 A. 2d 848; *Wilson v. Philadelphia School District*, 328 Pa. 225, 195 A. 90; *Wilkinsburg Boro v. School District*, 365 Pa. 254, 74 A. 2d 138.

In *Slippery Rock Area Joint School System v. Franklin Township S.D.*, 389 Pa., supra, the Court said (page 442) : " 'First, it should be remembered that our entire school system is but an agency of the State Legislature—maintained by them to carry out a constitutional duty. . . The school system, or the school district, then, are but agencies of the state legislature to administer this constitutional duty. Wilson et ux. v. Philadelphia School District, 328 Pa. 225, 230. Within that school system, a school district is an agency of the State, created by law *for the purpose of promoting education, deriving all of its powers from the statute, and discharging only such duties as are imposed upon it by statute* \*. . . .' "

In *Wilson et ux. v. Phila. S.D.*, 328 Pa., supra, where it was held that the Act of 1929 unconstitutionally

---

\* Italics throughout, ours.

delegated taxing power to the school district, the Court said (pages 231-232) : "The school system, or the school districts, then, are but agencies of the state legislature to administer this constitutional duty. *As such agencies, they do not possess the governmental attributes of municipalities.* . They are not municipal corporations: Wharton v. School Directors, 42 Pa. 358, not having legislative powers. . . . School District v. Fuess, 98 Pa. 600. They possess only the administrative powers that are *expressly granted by the central government or inferred by necessary implication.* The fact that they have the same territorial limits as municipal subdivisions does not change the character of their functions which are not municipal. . . ."

From the authorities cited and quoted above, it is clear (1) that the School District of Philadelphia is an agent or creature of the Legislature; (2) that it has no inherent powers of government; and (3) that the only powers, functions and duties it possesses are those which are expressly or by necessary implication authorized by statute.

The Public School Code* minutely details in approximately 270 pages, the powers, functions and duties of a School District. It also provides in Article VI, §610: "The use or payment of any public school funds of any school district, *in any manner or for any purpose not provided in this Act,* shall be illegal." A study, nay a reading, of the Public School Code demonstrates that the Legislature unquestionably intended and provided that the School District could possess and exercise only those powers and functions detailed in the Code, and that public school funds could be used only in the manner and for the purposes which are expressly or by necessary implication provided for in this detailed Act.

---

* Act of March 10, 1949, P.L. 30, 24 PS and its amendments.

Never heretofore have schools or school districts possessed or exercised, under the theory or name of Education, the wide basic powers, functions and duties of Municipal Government which are now claimed by the Board of Education, namely the prevention, suppression, correction, elimination and punishment of juvenile delinquency—euphemistic language to describe vandalism, misdemeanors and crimes committed by young persons—, gang control and the improvement of living conditions. It is clear that the main purpose of this Agreement is, at best, very indirectly and very remotely connected with Education. Virtually all of the work contemplated by this Agreement would be performed (a) outside of the schools, and (b) by an independent agency; and the program and the subject matters covered by the Agreement are a part of and are embraced not in Education but in the age-old functions and duties of Government. The contentions of the School District and of the City of Philadelphia and their construction of §§706 and 521 of the Public School Code, would necessarily, logically and unquestionably require the Courts to permit the School District to join with the City in expending public school funds for any and *every* purpose* which could be considered within the *City's* governmental powers. This would be contrary to the spirit, purpose and language of the Public School Code and the prior decisions of this Court construing it.

*Harris v. Board of Public Education,* 306 Pa. 546, 160 A. 443, relied upon by the City and the School

---

* It can readily be argued that nearly every conceivable thing that occurs today in the City and possibly in Russia or China or the Middle East or indeed in the entire world (missiles, atomic warfare, etc.) can affect a child's life, health, safety, morals or general welfare, and consequently can affect a child's education, no matter how far or remotely they appear to be removed from Education.

District, furnishes no basis or support for the present Agreement. In that case this Court held (a) that the Board of Education of the School District of Philadelphia County had the power and the discretion *to establish a school* in the County Prison* at Holmesburg, Philadelphia, for the instruction of prisoners between the ages of 16 and 21 years, and (b) that the exercise of such power did not conflict with the function of the State Department of Welfare, inasmuch as that Department does not assume the burden of educating the inmates of prisons, but confines itself to supervision of such education as may be provided. The Court aptly said (page 550): "The record fails to disclose impracticability of the proposal or of conditions tending to prevent a school in the county prison from being 'an integral part of the public school system,' . . . *'The purpose* at the base of our common school laws *is to provide all children* residing within the Commonwealth *with a good common school education.* In carrying out this purpose the various school districts are merely the agents of the Commonwealth: Ford v. School District, 121 Pa. 543; Gettysburg v. School District, 50 Pa. Superior Ct. 87. In construing the school laws, therefore, that interpretation will be adopted which will be more likely to carry into effect this generous purpose. The child is the paramount object of our common school law. *His education, . . . is its chief concern.'* "

The City also relies upon *Ehret v. Kulpmont Borough School District,* 333 Pa. 518, 5 A. 2d 188, where this Court said (page 522): " 'The fundamental public policy, expressed in the Constitution and underlying school laws, is *to obtain a better education* for the children of the Commonwealth.' The separate sections of the School Code all derive their inspiration from

---

* The proposed *prison school* was requested by the prison authorities.

this source. Though containing individual policies in themselves, each is subordinate to this cardinal purpose."

We thoroughly agree with the aforesaid quotations from the *Harris* and the *Ehret* cases, but they certainly do not aid the School District and the City in this case. We may add that a very worthy objective does not justify the action of a public body, such as a public school district, which has no inherent powers of government, unless that action is authorized by the Constitution or expressly or by necessary implication by an Act of the Legislature.*

The City and the School District originally sought to justify the Board of Education's expenditure of at least $125,000 for the year 1958 (with a provision for renewal) under the authority of §706 of the Public School Code. For example, the Agreement sets forth in the third WHEREAS clause: "WHEREAS, Section 706 of the Public School Code of March 10, 1949, (P.L. 30) authorizes the Board of Public Education of the School District of Philadelphia to join with the City '. . . in equipping, operating and maintaining playgrounds, playfields, gymnasiums . . . and indoor recreation centers, and . . . appropriate money therefor' ". Playgrounds, playfields, gymnasiums and school recreation centers have become widely recognized as a necessary and indispensable part or function of a school, not only in Philadelphia, but all over the United States. But even if it be assumed that these functions or the more remotely connected functions such as the furnishing of free milk, school nursing, a school doctor,

---

* Of course neither this suit nor the decision of the lower Court or of this Court prevents the City from carrying out the program and the important and worthy objective of seeking to solve, curb and eventually prevent juvenile delinquency—a duty, power and function of Government which it has always possessed.

school transportation and many of the other enumerated services are not so closely and directly a part of Education as to be *impliedly* included therein, the Legislature has *expressly and specifically* authorized these functions and facilities, as well as many others specifically set forth in the Code, and the expenditure of public school funds therefor.

The City and the School District apparently recognize that §706 cannot possibly authorize or legally justify the present Agreement because they now rely particularly upon §521 of the School Code, as well as upon the essential contention that they are authorized to spend public school funds in any manner and for any purpose whatsoever, unless specifically prohibited by the School Code. The latter contention, as we have seen, is absolutely devoid of merit.

Section 521 of the Public School Code provides: "Each board of school directors shall have power to enter into agreements with *other political* subdivisions, in accordance with existing laws, in making joint purchases of materials, supplies, or equipment, and in performing governmental powers, duties, and functions, and in carrying into effect provisions of law relating to said subjects, which are *common to all such political* subdivisions."

The City and the School District construe §521 as authorizing the School District to enter into an agreement with the City to perform *all* governmental powers, duties and functions which *are possessed by the City* (and similar political subdivisions) and to aid the City in these governmental functions by active cooperation and more particularly by the expenditure of public school funds. It would logically follow that the School District could use public school funds pursuant to an agreement with the City to share in the cost of construction and repair of streets and highways which are not adjacent to any school; to share in the payment

of the wages and salaries of the police and the firemen throughout the City, and of the Police Department and the Fire Department and the Water Department and the office of Mayor and all City Departments; to share in the cost of street lighting, street cleaning, and snow, trash and garbage removal; to share in the cost of the International Airport, the Art Museum, the Franklin Institute, the Robin Hood Dell, and the concerts on Reyburn Plaza. Under their broad construction of §521 the School District could share in the cost, and indeed could pay public school funds to an independent body for all these and a hundred other municipal functions which are very indirectly and very remotely connected, if at all, with public Education and which have always been considered part of the powers, functions and duties of municipal government. Such a construction is so contrary to the spirit, purpose, and language of the Public School Code that it would be unreasonable for a Court to determine that such was the intention of the Legislature.

To particularize: A program to curb juvenile delinquency, and to control gangs, and to coordinate programs of various agencies of and throughout the City for the purpose of reducing juvenile delinquency, and to organize sensitive areas in the City on a block-to-block basis in an effort to improve living conditions— these are not and never have been a part of the function, power or duty of a school or a school district. They are a very important and essential part of municipal Government: They are not and never have been a part of or embraced within "Education", as that term has always been understood. When we read §521 in connection with all the other provisions of the Public School Code, we cannot possibly construe that section (1) as authority for the Agreement here in suit, or (2) as justifying the creation of an independent Commission

which "shall not be considered an integral part of the program . . . of the School District, nor subject to the . . . Public School Code of 1949, as amended," or (3) as authorizing the expenditure of public school funds for such a program, Commission or Agreement.* To so construe §706 or §521—especially in view of the basic purpose of Education, and the detailed provisions of the Public School Code which minutely provide for the powers, functions and duties of a school district— would be to strain and stretch those sections beyond the bounds of reason.

Although neither the City nor the School District contend that any other Articles of the Public School Code authorize this Agreement, we have examined them and cannot find any support for the Agreement in any Article thereof. Whenever there is a matter or a function which may not be clearly, directly and closely connected and embraced within Education, it is specifically covered by the Code. This is a clear indication that if the Legislature intended to permit the expenditure of public school funds for any such program as that set forth in the Agreement in question, it would have clearly and specifically authorized it.

We are therefore convinced that neither the sections relied upon by the School District and the City, nor any other section in the Public School Code authorize this Agreement.

The authorities relied upon by the City and the School District which involved, *not the power*, but the discretion of school boards are clearly inapposite.** The School District was properly enjoined, not because the Agreement represented an abuse of discretion, but

---

* See also the very able opinion of President Judge OLIVER.

** See for example: *Ehret v. Kulpmont Borough School District*, 333 Pa., supra; *Regan v. Stoddard*, 361 Pa. 469, 65 A. 2d 240.

because, being unauthorized by statute, it was beyond the legal power of the School Board.

There is an additional reason why this Agreement cannot possibly be sustained. The Agreement provides, in paragraph 5: ". . . the program of the Commission shall be an independent undertaking and shall not be considered an integral part of the program of either the City or of the School District, nor subject to the requirements of either the Home Rule Charter or the Public School Code . . . ." The School Code specifically provides in §610: "The use or payment of any public school funds of any school district, in any manner or for any purpose not provided in this act, shall be illegal."

It is clear as crystal that this Agreement is illegal and void.

We have considered all the other contentions made by each of the parties but deem further discussion unnecessary.

Decree affirmed. Costs to be paid by appellants.

————

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In all the history of the world there was never a good deed counselled but that someone objected. Unanimity has been as rare as perfection itself, and so it has happened that, in the face of impending catastrophe, not everybody was of the same mind as to how to fight the fire, impede the flood, or defeat an invading virus. Thus, it is not surprising that there is lacking full concord on the manner and means of combatting the problem which today is the shame of the nation. However, while admitting that there may be different approaches to the problem of confronting and vanquishing the scourge of juvenile delinquency, and while every

one is entitled to advance his own ideas as to the method of attack, it is difficult to understand why anyone should object to a plan which is admittedly good,— in the absence of a plan which is better, or indeed, in the absence of any other plan at all.

The administration of the City of Philadelphia and the Board of Public Education of Philadelphia entered into an agreement (hereinafter to be referred to as the Agreement) in January, 1958, to create a joint committee to be known as the Youth Conservation Commission of Philadelphia. The Commission was to be composed of three members, one to be appointed by the Mayor, another by the President of the School Board, and the third by both the Mayor and the President of the School Board. In accordance with the Agreement, the following able public-spirited and experienced men were chosen: Judge William Hastie of the United States Court of Appeals, William Goldman and Randolph Wise. The able solicitor for the School District C. Brewster Rhoads, Esq., and the able City Solicitor, David Berger, were designated counsel for the Commission. The Agreement outlined a six-point project briefly summarized as follows: (1) to develop training and recreational programs; (2) to meet with children and parents and to recommend professional counselling; (3) to coordinate programs of other agencies dealing with juvenile delinquency; (4) to become familiar with and to work in depressed City areas which breed juvenile uprisings; (5) to participate in gang control; (6) to receive and to administer contributions in support of the program. The Commission was to be financed jointly by the City and School District, each to provide equal amounts up to a total of $125,000 for the calendar year 1958.

On January 30, 1958, Frederick H. Barth, a taxpayer and member of the School Board, initiated an action

in the Court of Common Pleas to enjoin the School District from proceeding under the Agreement, asserting that the School Board had no authority to enter into such a pact with the City. The Court of Common Pleas granted the prayer of the plaintiff, declaring the Agreement null and void; and this appeal followed.

The decree of the lower Court has now been affirmed by this Court, which, speaking through a majority, does not say that the enterprise envisaged by the Agreement is not a good one. Nor does it minimize the seriousness of the juvenile delinquency rampant on the streets of Philadelphia, endangering life and limb of citizens and threatening destruction of property. On the contrary, the Majority emphasizes the gravity of the situation: "A program to study and curb juvenile delinquency is not only worthy, but highly desirable. The crime wave which is sweeping our Country, and particularly the rise and extent of juvenile delinquency, and the vandalism and the atrocious crimes committed by juveniles has astonished, troubled and appalled our entire nation. According to the Committee of Seventy in their May, 1958 issue of Civic Affairs, 9027 young persons under the age of 18 years were arrested in Philadelphia by the police in 1957. 46 out of every 100 arrests made for major crimes in Philadelphia, according to the F.B.I. Classification of Major Crime Offenses, were of young persons between the ages of 13 and 18 years. A major crime offense under the above mentioned classification meant murder, rape, robbery, burglary and auto theft."

However, after painting this lurid but accurate picture, it announces that the school authorities may do nothing about it. The fire is blazing, the waters are rising, and the pestilence is upon us, but nothing must be done by those most qualified to do something, because, the Majority says, the law does not permit them to act. Is the law so strange as that? I do not think so.

In fact, the law, as I read it, not only permits the school authorities to act, but demands that they act. Of what use is education if, instead of inculcating into youth the principles of honesty, morality, patriotism and discipline, it turns out hoodlums, miscreants, ruffians, wrongdoers, and criminals?

If there is one thing the framers of our Constitution and the makers of our law intended to give to school officials, it was the authority to develop programs which would instil into children the desire and the equipment for good character, honorable conduct, obedience to parents, and loyalty to the ideals of the State and Nation. One of the most formidable pillars of our whole constitutional structure is the provision (Article 10, Section 1) that the Commonwealth guarantees the *"maintenance and support of a thorough and efficient system of public schools."** The machinery for the maintenance and operation of a thorough and efficient system of public schools is found in the Public School Code which requires school directors to "define the general policies of the school system," and to *"determine and direct all expenditures for the maintenance and improvement of the school system"* (Act of March 10, 1949, P.L. 30, Art. XXI, §2103, 24 P.S. §21-2103).

Would school directors discharge their obligations and fulfill their duties of *maintaining and improving the school system* if they allowed the school buildings to fall into a state of ruin and decay? Is there less' neglect on their part if they see the character of school children deteriorating but they do nothing to arrest such ruin and decay?

The first symptoms of juvenile delinquency are usually exhibited through disorder in the classrooms; rowdiness on the school grounds; disrespectful attitude toward teachers; loud, boisterous and offensive lan-

---

* Italics throughout, mine.

guage; boasting and bravado in tilts with authority. The next development of the disease is manifested through street corner loafing, alley fighting, tardy homecoming at night. Then follows actual crime: robbery, burglary, even homicide. Juvenile delinquency is a matter of concern in every home, it worries every school official, it is a subject for grave discussion and deliberation in churches, civic societies, and law enforcement offices. Philadelphia City Solicitor David Berger states correctly and cogently in his excellent brief that: "Juvenile delinquency is a major threat to the proper functioning of the school system. It means absenteeism, destruction of school property, disrespect for teachers, and contempt for the moral and intellectual attitudes which the schools are intended to foster. . . School authorities are concerned with all delinquent behavior, whether in or out of school, because the purpose of education is to make good citizens and each delinquent child is evidence of failure."

School District Solicitor C. Brewster Rhoads states correctly and cogently in his excellent brief that: "The concern of the School District is at the heart of the educational program. Widespread juvenile delinquency is evidence of some failure in our society. Education has failed, somehow, to reach the delinquent. If any agency can find out why this failure has occurred, it will have made a most significant contribution to public education."

Is government, which is prepared to meet every emergency affecting law and order, helpless before the hoodlumism of irresponsible youths? It would be absurd to so conclude. The legislature of Pennsylvania anticipated long ago that school officials could better meet and discharge their responsibilities and duties in the field of education if they could obtain the assistance and cooperation of other officials. Since train-

ing the children of the land for good citizenship is strictly a governmental function, the Legislature enacted into the School Code the provision that: "Each board of school directors shall have power to enter into agreements with other political subdivisions, in accordance with existing laws, in making joint purchases of materials, supplies, or equipment, and *in performing governmental powers, duties, and functions,* and in carrying into effect provisions of law relating to said subjects, which are common to all such political subdivisions." (Public School Code of 1949, P.L. 30, §521, 24 P.S. §5-521.)

In January, 1958, the School Board of Philadelphia, as already stated, decided to use this beneficent law in its determined and praiseworthy effort to turn back the rowdy tide of green hooliganism inundating the streets of Pennsylvania's largest city. The Board conferred with the Mayor and other officials of the City and entered into the excellent compact for mutual defense and counterattack against crime, which this Court has seen fit to declare illegal. In striking down the Agreement, this Court, speaking through the Majority Opinion says that: "The City and the School District construe Section 521 as authorizing the School District to enter into an agreement with the City to perform *all* governmental powers, duties and functions which *are possessed by the City* (and similar political subdivisions) and to aid the City in these governmental functions by active cooperation and more particularly by the expenditure of public school funds." (Emphasis in Majority Opinion.)

This is an odd interpretation of the City's and School District's position. Neither in their oral arguments nor in their printed briefs did counsel for the City or School District ever say that under Section 521 the school district was authorized to enter into agreements

to perform *all* governmental functions possessed by the City. Obviously the provisions of the Agreement would have to pertain to something involving education and school children.

It is a *non sequitur* for the Majority to say, as it does, that allowing a school district to use public school funds to fight juvenile delinquency, would mean allowing the school district to use school funds to construct and repair streets. Such an argument represents gross exaggeration in no way related to logic. An analogy, in order to appeal to reason, must bear some kinship to reality. For instance, it could not be insisted that, because the school district is authorized to buy lead pencils, it may buy telegraph poles, since telegraph poles have the same shape as lead pencils, even if slightly larger.

The program agreed upon between the City and the School District provides for education of school children who are disposed to delinquency. This is certainly germane to the responsibilities of a school board, and it is no answer to the legal position of the City and the School Board to say that if the School Board is allowed to fight juvenile delinquency, it may then clean streets, shovel snow, carry trash and remove garbage.

The Majority Opinion says that: "A program to curb juvenile delinquency, and to control gangs, and to coordinate programs of various agencies of and throughout the City for the purpose of reducing juvenile delinquency, and to organize sensitive areas in the City on a block-to-block basis in an effort to improve living conditions—these are not and never have been a part of the function, power or duty of a school or a school district."

But if curbing the delinquency of children of school age cannot be considered a part of the functions, powers, and duties of a school district, how does the Majority

justify the expenditure of school funds for the maintenance of a school in the Philadelphia County Prison for the instruction of children between the ages of 16 and 21 years? An attempt was made in 1932 to enjoin the School Board's approval of this project but in the ensuing litigation (Harris v. Phila. S. Dist., 306 Pa. 546, 548) this Court said: "The authority of the school board as defined in section 401 of the Act of May 18, 1911, P.L. 309, 329, embraces the establishment, equipment and maintenance of 'a sufficient number of elementary public schools. . . to educate every person, residing in such district, between the ages of six and twenty-one years, who may attend. . . *together with such other schools or educational departments as they, in their wisdom, may see proper to establish.'* The last clause quoted is significant. In broad terms, *it reposes a wide discretion in the school board to institute,* besides specifically named classes of schools and *educational departments '. . . as they, in their wisdom, may see proper to establish.'* "

Our Court then went on to say that: "The school board undoubtedly is vested with authority to establish the school here proposed. It is simply another educational department which, *in its wisdom, the school board sees fit to create.* The fact that pupils in attendance who reside within the school district and are otherwise proper subjects for schooling, are temporarily in a prison, does not place them beyond the pale of state education. On the contrary, efforts to raise their standards and fit them for liberty by the establishment of schools or other means to aid them should be upheld where the provision of law, as in the case before us, is sufficiently comprehensive to sustain such action."

If we are to adhere to what we said in that case, and this present Court has not repudiated the precedent, I don't see how we can say that the School Board of 1958

has less wisdom than the School Board of 1932. If the School Code, without specifically so stating, permits the education of children who have already become criminals, how can it be argued that it denies special educational treatment for those destined to become criminals unless properly instructed? If the school authorities may provide medical care for school children, why should they be denied the exercise of their wisdom in providing special educational treatment for students, who, because of mental or psychological undevelopment, manifest a tendency toward delinquency?

Before, however, there can be specialized educational treatment, there must be research as to the exact nature of the malady to be treated. There can be no intelligent solution of any problem without a thorough study of all the factors which go to make up the problem. Research is the surveyor's team which plots the highway over which government travels in reaching the objective of maximum service to the people.

It cannot be questioned that a school district would have the right to employ experts to work out plans and courses for special educational courses, particularized training, and rehabilitating recreational programs. And no one would protest if this undertaking by experts were called a Youth Conservation Commission. Why, then should anyone object if such a Commission devotes itself to applying such courses, training, and programs to combatting juvenile delinquency?

Going that far, why should there be objection to such a Commission cooperating with the City, which also has a responsibility in the matter of keeping the streets, schools, and homes free of crime and delinquency? Why should it be necessary for anyone to have to argue so strenuously to show that this is exactly what the Legislature had in mind when it enacted Section 521 of the School Code which says, in words

as clear as sunlight, that "school directors shall have power to enter into agreements with other political subdivisions . . . in *performing governmental powers, duties,* and functions"? Administering schools is surely a governmental function, and who can question that rooting out the weeds of delinquency from the school yards and cleansing the classrooms of the fungus of insolence and disrespect cannot be other than *improving the school system* under the mandate of the School Code (Art. XXI, Sec. 2103)?

In attempting to distinguish the *Harris* case, which, as I see it, is irrefutable authority for what the School Board has done here, the Majority quotes: " ' "The child is the paramount object of our common school law. His education . . . is its chief concern." ' " But is that not the paramount object of the program embraced in the Agreement? The undertaking of the School Board, through the Youth Conservation Commission, is one of educating juveniles to respect law, parents, morals, and the standards of decency. The Majority seems to believe that the rule announced in the *Harris* case can not apply to the instant case because in the *Harris* case the proposed prison school was requested by prison authorities. But how does that change the facts facing us here where the program is desired not only by prison authorities but is implored by the whole population which suffers from the maraudings of the young ruffians who roam the streets at night bent on mischief, terror and evil?

In reaching its decision, the Majority obviously gave no heed to what this Court said in *Wilson v. School District of Philadelphia,* 328 Pa. 225, 239: "The exercise of discretion by the school authorities will be interfered with *only* when there is a clear abuse of it, and *the burden of showing such an abuse is a heavy one.* In those few instances where the court has inter-

fered with the administrative power of school boards, the interference was based on the school boards' manifestly illegal action in violating the express words of statutes defining their powers or on facts clearly indicating bad faith and violation of their public duty."

Wherein does the School Board in the case at bar violate "express words of statutes defining their powers or on facts clearly indicating bad faith and violation of their public duty?" The Majority cannot point to any such violation for the simple reason that such express words of statutes do not exist.

Unable to point to any statutory violation, or to charge bad faith on the part of the School Board, the Majority cites three decisions which, it assumes, stand as mighty oaks in the path of the progressive announcement by the City and the School Board of Philadelphia. But these assumed oaks are only small bushes of doubtful relevancy, and do not cover the subject of this case any more than a cabbage leaf covers a lawn.

One of the cases cited by the Majority is *Slippery Rock Sys. v. Franklin Twp. Dist.*, 389 Pa. 435. That case decided that a member district of a joint school system was bound by the decision of the joint school system board referring to the construction and financing of a school building contemplated by the jointure. This Court said in that case, as quoted by the Majority: " 'Within that school system, a school district is an agency of the State, created by law for the purpose of promoting education, deriving all of its powers from the statute, and discharging only such duties as are imposed upon it by statute.' " But there is nothing in the *Slippery Rock* decision which, by the remotest analogy, can be construed to mean that the appropriation of money for an educational program to reform wayward school children is not within the compass of the statute outling the powers of school boards.

The second case cited by the Majority, *Wilson v. Philadelphia Sch. Dist.*, 328 Pa. 225, held that a certain Act, insofar as it provided that in school districts of the first class the board of school directors should levy a tax in an amount sufficient to cover the expenditure to be incurred in the maintenance of the school system, was unconstitutional. In an Opinion of 22 pages, plus a Supplemental Opinion, one looks in vain for some limitation on the power of a school board to appropriate money for an educational program intended for school children disposed to crime. On the contrary, this Court said in that case, as already quoted, that "the exercise of discretion by the school authorities will be interfered with only when there is a clear abuse of it," for instance, "when there is a violation of "the express words of statutes defining their powers." Where has the present School Board of Philadelphia violated any express words of statutes?

The third case cited by the Majority, *Wilkinsburg Boro v. School District*, 365 Pa. 254, held that an Act of the Legislature authorizing municipal bodies to levy and collect certain taxes did not grant them the power to compel a school district or any other agency of the Commonwealth to collect such taxes for their benefit. Can anyone see in this statement a prohibition against a School Board's spending money for instructing school children disposed to crime? Can anyone see in this statement any relevancy to the subject in controversy?

After citing the three cases here indicated, the Majority Opinion says that it is clear from these authorities that: "(1) that the School District of Philadelphia is an agent or creature of the Legislature; (2) that it has no inherent powers of government; and (3) that the only powers, functions and duties it possesses are those which are expressly or *by necessary implication* authorized by statute." It was not neces-

sary to cite cases to lay down such fundamental rules, with which no one can possibly quarrel. What we have to decide is not whether or not a school district is an agent of the Legislature and whether or not it has inherent powers of government. The answers to those queries are obvious. The only question is whether where there is no express authorization for the exercise of certain powers, authorization may nevertheless be derived by necessary implication from the written grant of powers. The City and the School Board here contend that the power to enter into the Agreement may easily be found in the School Code "by necessary implication."

I am definitely of that view also, and so has this Court been of that view up until today. We have said in more than one case that so long as the object is a worthy one pertaining to the education of children, this Court will not restrict the School Board in the development of a wholesome program. Thus, we declared quite emphatically in the *Harris* case that: " 'The purpose at the base of our common school laws is to provide all children residing within the Commonwealth with a good common school education. . . In construing the school laws, therefore, *that interpretation will be adopted which will be more likely to carry into effect this generous purpose.* The child is the paramount object of our school law. His education and not the exact apportionment of its cost among various subdivisions of the Commonwealth, is its chief concern.' "

In *Kaplan v. Philadelphia School District*, 388 Pa. 213, we held that a school superintendent has the right to suspend a teacher who refused to say whether he is or is not a member of the Communist Party, even though there is no provision in the School Code which specifically gives him that power. The right to suspend for misconduct is an inevitable concomitant to

the right to employ, when the misconduct is inimical to the physical and moral welfare of the children. Judge WOODSIDE of the Superior Court well expressed this principle in that case when it was before the Superior Court (178 Pa. Superior Ct. 88.) We affirmed his statement, namely: *"Although there is nothing specific in the Code relating to suspension, such right is inherent in the school district.* The duty to 'provide for the maintenance and support of a thorough and efficient system of public schools' for the education of the children of this Commonwealth is imposed upon the legislature by the Constitution of this Commonwealth. See Article X, Section 1. *The term 'education' includes cultivation of morality as well as attainment of knowledge and intellectual culture . . . 'The aim and object of our school system',* said Justice DREW in Walker v. Scranton School District, 338 Pa. 104, 109, 110, 12 A. 2d 46 (1940), *'is to provide the best education for the children of the Commonwealth.* It cannot be doubted that it was the intention of the Legislature to subordinate all other considerations.' "

In *Lehigh Coal & Nav. Co. v. Summit Hill S.D.,* 289 Pa. 75, 81, we held that school districts possess "such powers as are expressly or by *necessary implications* given them."

This necessitous interpretation is not confined to school directors. Every public official is allowed some latitude in choosing the manner of discharging his obligations. Government would move like a turtle scaling steps if every action of officials had to be spelled out in statutory blueprint. In *Commonwealth v. Picard,* 296 Pa. 120, this Court said: "Where [public] officers are entrusted with general powers to accomplish a given purpose, *they include as well all incidental powers or those that may fairly be deduced from the ends intended to be accomplished."*

It would seem that the lower Courts are more disposed to follow the very instructions of this Court than this Court itself. In 1934 a taxpayer in Philadelphia sought to restrain the School Board of Philadelphia from buying tickets for school children to enter the Zoological Gardens where they could study at first hand the habits and characteristics of birds and animals. The taxpayer argued there, as the taxpayer argues here, that there was no provision in the School Code which spelled out this expenditure. The Court of Common Pleas of Philadelphia dismissed the taxpayer's bill and sententiously declared: ". . . when any action of the board of education is under attack before the courts, it is not always necessary for the board to point to a special section of the school law which authorizes specifically the particular thing that the board proposes to do or did, nor is it necessary on all occasions to justify an expenditure or a contract by any such means. *So long as the act, expenditure, or contract in question is not forbidden either expressly or impliedly by the School Code, it is sufficient if the act, expenditure, or contract was done, made, or entered into for a purpose authorized either specifically or impliedly by the code*: Hagan Lumber Co. v. Duryea School District, 277 Pa. 345, 349." (*Harris v. Phila. Board of Education et al.*, 22 D. & C. 15, 17.)

The decision of the Court of Common Pleas was so in line with what this Court had been saying for decades that no one thought of appealing that decision to this Court. Did we have greater educational vision in 1934 than we have in 1958? Is it proper to spend money to allow children to visit the zoo to study the strange antics of monkeys, goshawks, and hyenas and yet improper to spend money to ascertain why some juveniles are aping the predatory antics of goshawks, monkeys and hyenas?

The School Code specifically says that: "The duties of the board of public education of the first class . . . shall be (1) To define the general policies of the School system, (2) To legislate upon all matters pertaining thereto, (3) To determine and direct all expenditures for the maintenance and improvement of the school system."

When should the directors act to improve the school system? After damage has been done? After children have become hardened criminals? Does not the simplest reflection dictate that the time to attack juvenile delinquency is when it is forming in the bud of adolescent irresponsibility, and not when it has developed into the deadly nightshade of consummate criminality? If we examine some of the current literature on the subject of untoward school children, we will find extensive confirmation of the proposition that the problem of undisciplined youth is peculiarly and particularly the responsibility of school administrators. M. R. Sumption, Head, Office of Field Services, University of Illinois, says on the topic of supervision of school children: "Two general principles . . . have . . . been rather consistently followed by the courts. The first is that any act of a pupil detrimental to the orderly discipline or well-being of the school, regardless of where committed, is of legitimate concern to the school. The second is that *the school has prohibitory and punitive power over the acts of pupils which interfere with their school work or with other pupils, or reflect on the reputation* of the school." (The Control of Pupil Conduct by the School (20 Law and Cont. Prob. 80, 85 (1955))).

Delinquent children are exceptional children and must be treated as such: "The school is more important in the lives of problem children than in those of normal children, as it is not only an educative force but often is the only agency giving them an opportunity to acquire habits of adjustment to the world in which they

live . . . In the development of a program geared to the needs, interests and capacities of exceptional children, school administrators must lead the way. The community—and sometimes members of the professional staff—must be educated to the extent and character of such special needs. *Adequate financial support must be arranged.* Administrative and supervisory leadership must be provided to assure a well-planned, coordinated program." (The Expanding Role of Education Twenty-Sixth Yearbook of the American Association of School Administrators (1948)).

The work set out for the Youth Conservation Commission by the Agreement is one which comes peculiarly within the ambit of school administration because it involves constant conferring with school officials, teachers, and truant officers and consultation of school records. What conceivable objection can there be to so salubrious a program, so sensible a project, so facile a procedure, and so pragmatic an approach to conditions which imperiously and immediately demand correction? The indicated program is not a radical one. It does not encroach upon the functions of police or detective squads. In the main, it is one of study and education. How is the present appalling tendency toward criminality to be arrested except by a study of the soil in which, like an ugly plant, it grows and flourishes? If children are truant because they are meeting and consorting with others bent on delinquency, how can this be ascertained except by visiting the homes of the truants, inquiring about them of neighbors, and investigating conditions which contribute to the disposition toward crime?

Why is it that there is more juvenile delinquency today, in volume and percentagewise, than there was decades ago? And this, in spite of the progress we assume we have made in the whole field of education?

Is it because children today have too many liberties? Is it because they have enjoyments which were denied the youth of years ago? Is it because the rod is being spared? Certain it is that a parental slap, cuff, or thrashing in the old days would never set to wagging the tongues of community busybodies as it would today. Is it because school children are seeing too many motion pictures and television shows which are devoted to crime and violence? Is it because too many imitation weapons are being sold in the toy stores? One cannot walk through a neighborhood of playing children but that he is "winged" by a machine pistol, "killed" by a guided missile, and "disintegrated" into the circumambient air by a space gun? Are we allowing youth to believe that the greatest fun in life is that of destroying it? Is it because children are reading too many so-called comic books which do not have a laugh in a carload but which are awash with human gore? Is it because uninhibited salacious literature and suggestive cinema programs pander to the passions of immaturity?

No one can answer these questions in a vacuum churning with theory, guess, surmise, and conjecture. There must be a gathering of facts and an evaluation of those facts. There must be study, reflection, deliberation. The Youth Conservation Commission would do this. The Majority Opinion does not say that the project outlined in the Agreement is unfeasible, unworkable, unwise. What, then, is the objection? Expense? Is the spending of $125,000 exorbitant for what it is expected to accomplish?*

Millions of dollars are spent on magnificent school buildings which architecturally and artistically would

---

* The Commission is empowered to receive voluntary contributions. Thus, the taxpayers would not be required to sustain the entire expense of the undertaking.

dim the grandiosity of royal mansions; a Texan fortune is annually expended on stadiums that rival the imposing dimensions of the Roman Coliseum; rivers of money are poured into swimming pools, football gridirons, baseball diamonds, and gymnasiums. No one decries these vast outlays because it is assumed, not without reason, that they all contribute to the education of youthful minds, to the building of healthful bodies, and to the preparation of growing children for the responsibilities of citizenship. How, then, can there be a just protest against the spending of a paltry $125,000 for the building of the most important edifice of all—the edifice of good character, sound morals, and enduring respect which will give greater meaning to the school buildings, the stadiums, and the wholesome rivalry of athletic games?

The Majority gives to the School Code a very narrow interpretation which does not comport with the spirit of the Code and the will of the Legislature. Education is the foundation of our whole democratic structure; it is the hope of the future. " 'Tis education forms the common mind: Just as the twig is bent, the tree's inclined." The continuing life of the State and Nation depends on the children of today who will be the adults of tomorrow.

In its decision of today I regret to observe that the Majority is taking a retrogressive step. The destiny of a civilization is "not of the letter but of the spirit." I am reminded, in this connection, of the tribute paid to sociological progress by Chief Justice HORACE STERN in the case of *Dornan v. Housing Authority*, 331 Pa. 209, 213. When it was there argued that a public housing authority was unconstitutional, that it was a startling thing which should not be countenanced, that it had no precedent, and could only bode evil consequences. Chief Justice STERN replied: "Such chal-

lenges must fail, however, if, upon analysis, it appears that the only novelty in the legislation is that approved principles are applied to new conditions. *Neither our State nor our federal constitution forbids changes, merely because they are such, in the nature or the manner of use of methods designed to enhance the public welfare;* they require only that the new weapons employed to combat ancient evils shall be consistent with the fundamental scheme of government of the Commonwealth and the nation, and shall not violate specific constitutional mandates."

The Agreement entered into between the City and the School Board of Philadelphia has opened up a magnificent horizon of cooperation between two serious-minded departments of government, joined together in a common cause to restore the luster of innocence to the shining name of youth. I fear that the Majority has lowered over that horizon a dark cloud of technicality which has no silver lining of constitutionality or of law.