Susan CASTLE, et al.

v.

COLONIAL SCHOOL DISTRICT, et al.

Civ. A. No. 95–6685.

United States District Court, E.D. Pennsylvania.

July 19, 1996.

A. Martin Herring, Philadelphia, Pennsylvania, for plaintiffs.

Francis P. O'Hara, Norristown, Pennsylvania, for defendants.

### *MEMORANDUM*

WALDMAN, District Judge.

Plaintiffs are teachers employed by the Colonial School District. Defendants are the School District and members of its governing school board. Plaintiffs seek a declaration that a School District policy prohibiting school employees from engaging in political activities on School District property at any time violates plaintiffs' First Amendment rights when invoked to prevent off-duty employees from soliciting votes at official polling places which happen to be on school property. Plaintiffs also seek to enjoin defendants from enforcing that policy to bar political activity at such polling locations by employees during non-working hours.[1]

The parties agree that there are no genuine issues of material fact in dispute and they have filed cross-motions for summary judgment. The court finds that the material facts indeed are not disputed and thus must

---

1. Actually plaintiffs specifically ask in their pleadings only for an injunction prohibiting defendants from taking "adverse employment actions" against employees who violate this policy. It appears, however, that they would also object to other coercive action which could be taken to enforce this policy, and they do ask for "such other and further relief as may be just."

determine which party may be entitled to judgment as a matter of law. *See Manetas v. International Petroleum Carriers, Inc.,* 541 F.2d 408, 413 (3d Cir.1976); *Texaco Refining and Marketing, Inc. v. Delaware River Basin Commission,* 824 F.Supp. 500, 506 (D.Del.1993), *aff'd,* 30 F.3d 1488 (3d Cir. 1994).

The pertinent facts are as follow.

On November 4, 1993, a private citizen wrote to the Board of School Directors of Colonial School District (the "Board") to express her concern that a telephone and other equipment maintained by the School District were being used by the Colonial Education Association (the "CEA"), a teachers' union, to secure volunteers to assist the Union in efforts to help elect certain candidates to the Board. The allegation was confirmed by plaintiff Castle, president of the CEA, who assured the School District superintendent by letter of November 10, 1993 that this was an "unintentional oversight" and future use of School District property for political activities would not occur.

In response to the citizen complaint, the Board adopted a policy on January 20, 1994 entitled "Prohibited Political Activities for Employees" ("the Policy"). The Policy prohibits the use of School District equipment in connection with political activities. It also prohibits employees "from engaging in political activities of any nature on school District property at any time" and from engaging in political activities during working hours at any place. The definition of "political activities" includes "posting, preparing or distributing materials promoting the candidacy of any candidate or political party." The Policy contained the following provision: "Nothing in this policy is to be interpreted to mean that School District employees may not on their own time engage in political activities at an official polling place if such officially designated polling place is on school property."

A first violation of the policy results in a suspension without pay. A second violation is referred to the Board for consideration of further disciplinary action, including termination of employment.

On April 21, 1994, the Board revised the Policy by removing the provision permitting employees to work at polling places located on school property. In September 1995, plaintiff Castle sought a clarification of the Policy with respect to the issue of employees working at the polls. On September 21, 1995, the Board reaffirmed its commitment to full enforcement of the Policy as revised, which included its interpretation that employees would be prohibited from working at polls located on school property. Of the twenty-seven polling places in the District, four are located on school property.[2]

On October 20, 1995, plaintiffs filed this action and moved for a preliminary injunction against enforcement of the portion of the Policy prohibiting employee presence at polls on school property on the impending election day of November 7, 1995. That motion was denied as moot when defendants agreed to waive enforcement for the upcoming election day.[3]

■ To determine whether government restrictions on the speech of its employees can survive a First Amendment challenge, the court must weigh "the interests of the [employee], as a citizen, in commenting upon matters of public concern" against "the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). While the *Pickering* balancing test is most often utilized in cases where disciplinary action is taken against a public employee for engaging in disruptive or controversial communications, it is also applied in cases involving a prospective ban on employee speech. *United States v. National Treasury Employees Union,* —— U.S. ——, ——, 115 S.Ct. 1003, 1014, 130 L.Ed.2d 964 (1995) ("*NTEU*") (applying *Pickering* in challenge to ban of honoraria for speeches by federal

**2.** School boards must arrange for the use of school property for polling upon a request from a county board of elections. *See* 25 Pa.S.A. § 2727.

**3.** Plaintiffs do not challenge the prohibition of political activities during working hours or use of any School District equipment in connection with such activities.

employees); *United States Civil Service Commission v. National Association of Letter Carriers, AFL–CIO,* 413 U.S. 548, 564, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973) (applying *Pickering* in challenge to prohibition on political activities by federal employees).

■ The government's burden to justify the *ex ante* prohibition of speech, however, is greater than to justify an *ex post* disciplinary action. *NTEU,* —— U.S. at ——, 115 S.Ct. at 1014. The government must show that "the interests of the potential audience and of present and future employees in expression are outweighed by the necessary impact of such expression on the actual operation of government." *Id.*

■ Whether particular speech touches on a matter of public concern is determined by the content, form and context of that speech. *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983). A government employee's speech addresses a matter of public concern when it can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Watters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir.1995); *Sanguigni v. Pittsburgh Bd. of Public Education,* 968 F.2d 393, 397 (3d Cir.1992). The views of School District employees on the merits of candidates for public office, communicated to voters at official polling locations on election day, clearly involves a matter of "public concern." *See Goodman v. City of Kansas City, Missouri,* 906 F.Supp. 537, 541 (W.D.Mo.1995) (public employees' display of support for political candidates is speech involving matter of public concern). *See also Burson v. Freeman,* 504 U.S. 191, 196, 112 S.Ct. 1846, 1850, 119 L.Ed.2d 5 (1992) (advocacy of candidates at polling places is quintessential speech protected by First Amendment).

■ School employees have a strong interest in participating in political activities, including the distribution of information about candidates on an election day. *Goodman,* 906 F.Supp. at 542 (one's "right to express oneself about issues and candidates at election time is an essential part of our constitutional democracy"). *See also Buckley v. Valeo,* 424 U.S. 1, 13, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) (the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office"); *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968) ("no right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live").

The interest of the public audience in receiving these communications is also substantial. *NTEU,* —— U.S. at ——, 115 S.Ct. at 1014; *Goodman,* 906 F.Supp. at 542. Particularly with respect to school board elections, school district personnel may be in a unique position to provide the public with information and informed opinions on matters affecting educational quality. *Lees v. West Greene School Dist.,* 632 F.Supp. 1327, 1331 (W.D.Pa.1986). *See also Sanjour v. E.P.A.,* 56 F.3d 85, 94 (D.C.Cir.1995) ("government employees are in a position to offer the public unique insights into the workings of government generally and their areas of specialization in particular"); *Pieczynski v. Duffy,* 875 F.2d 1331 (7th Cir.1989) ("public employees have valuable insights and information about the operation of the government to convey").

Defendants argue nevertheless that the speech at issue does not involve a matter of public concern because it is motivated by self-interest. Defendants suggest that the CEA and its members advocate the election of School Board candidates perceived to be more disposed to favor the teachers' interests regarding terms and conditions of employment.

There is, however, no evidence of record to sustain this supposition. Indeed, defendants acknowledge and there is uncontroverted testimony that different teachers have supported rival candidates and CEA members have worked at the polls for candidates opposed by the union. There is no evidence that teachers in the defendant District limit their expressions of support to candidates for the School Board or select such candidates

based on selfish concerns.[4]

■ How and where information is conveyed, i.e. form and context, may indicate whether it involves a matter "only of personal interest" or one of public concern. *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. Even where speech is motivated by personal interest, however, it may still involve a matter of public concern because of its content. *See O'Connor v. Steeves,* 994 F.2d 905, 914 n. 5 (1st Cir.1993); *Zamboni v. Stamler,* 847 F.2d 73, 78 (3d Cir.), *cert. denied,* 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988); *McKinley v. City of Eloy,* 705 F.2d 1110, 1114 (9th Cir.1983) (public criticism by police officer who was union representative of city council's denial of pay raise for police was protected speech involving matter of public concern).

It would be untenable to permit one teacher to advocate the election of a school board candidate because she altruistically approves of that candidate's commitment to enhanced academic standards while preventing another teacher from doing the same because he is motivated by that candidate's promise to support better benefits for teachers. The topic of the speech in either event implicates core First Amendment concerns. *O'Connor,* 994 F.2d at 914 n. 5. Notably, the Policy does not restrict Board members from communicating with voters at polling locations on school property.

The content of the speech at issue involves the positions and perceived qualifications of persons seeking public office. The form consists of traditional election campaign material. The context is a direct and open appeal to voters to elect particular candidates to public office. It is the type and manner of speech which lies at the heart of the interests protected by the First Amendment and must be afforded substantial weight.

■ To justify the Policy, defendants rely on asserted governmental interests in diminishing disruption in the educational process, in protecting voters from undue influence at polling places and in avoiding the appearance of an official endorsement of particular candidates. Of course, government must do more

than merely articulate an interest. It must demonstrate that the expression at issue has a "necessary impact on the actual operation" of the school district. *NTEU,* —— U.S. at ——, 115 S.Ct. at 1014. "[W]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.,* at ——, 115 S.Ct. at 1017.

To support their stated concern about potential disruption in the educational process, defendants rely only on the fact that teachers working at the same polling location have supported rival candidates. There is no evidence that this support was other than peaceful and dignified or had any disruptive impact on the educational process. There is no evidence to support a finding that school employees have been or likely will be unable to work compatibly with co-workers who support different candidates. Everyday, Americans with different philosophies and political affiliations and who are actively supporting rival candidates work side by side compatibly and without incident. There has been no showing that employees of the Colonial School District cannot or will not do the same.

Moreover, the Policy does little to alleviate this perceived risk. Consistent with the Policy, fellow employees may still work opposite each other in support of rival candidates at the vast majority of polling places in the District which are not located on school property.

In support of their stated concern about teachers exercising "undue influence" over voters, defendant Board members testified that they had received complaints from citizens who felt "uncomfortable seeing teachers at polling places." None, however, was able to provide the name of any individual who had complained despite the testimony of one Board member that she had notes at her home with such names. Notably, these citizen complaints had been received for several years before the Policy was adopted.

---

4. Also, as noted, the Policy applies to *all* school     employees and not only to teachers.

Defendants rely on *Burson v. Freeman*, 504 U.S. 191, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) to justify a ban to prevent undue influence. The Court in *Burson* upheld a state statute prohibiting the solicitation of votes and display of campaign materials within one hundred feet of a polling place. The Court found that states have a compelling interest in maintaining restricted areas adjacent to polling places, *id.* at 200, 112 S.Ct. at 1852, and noted that all 50 states limit access at polling places. *Id.* at 206, 112 S.Ct. at 1855. The Court also noted that such restrictions must be "generally applicable and even handed," *id.* at 199, 112 S.Ct. at 1851, and made clear that any attempts to regulate such speech outside of this "protected zone" would be impermissible. *Id.* at 210, 112 S.Ct. at 1857. *Burson* did not involve an effort to exclude only one particular group or restrictions applicable only at selected polling places.

That some voters felt "uncomfortable" about the presence of teachers at polling places is insufficient to overcome the interest of teachers in expressing their views in circumstances where others are free to do so and of other voters in receiving those views.[5]

Moreover, the Policy does little to alleviate the perceived "undue influence" of teachers. They may still communicate their views to voters by mail, telephone, signs, sound trucks, letters to editors, door to door canvassing and media advertising. Indeed, they may advocate the election of candidates at twenty-three of the twenty-seven polling places in the district.[6]

Defendants have an interest in avoiding an appearance of an "official endorsement" of candidates by the School District. The impartiality of the government in the political process is an important interest. *See Letter*

*Carriers,* 413 U.S. at 565, 93 S.Ct. at 2890; *Naccarati v. Wilkins Twp., Pennsylvania,* 846 F.Supp. 405, 410 (W.D.Pa.1993). There is, however, no evidence from which one reasonably can find that there is any appreciable risk of the feared misperception.

Printed materials that have been distributed were clearly marked to indicate their origin. There is no showing that the teachers or the campaign materials they used ever stated or implied that the School District had endorsed a candidate or officially supported the position of its off-duty employees. The risk that voters may misperceive an official endorsement is further attenuated by the fact that various teachers support different candidates, something about which defendants profess concern in arguing that the Policy will prevent antagonism which may disrupt the educational process.

Moreover, the Policy does little to obviate the feared misperception that if teachers are supporting a particular candidate, they must be doing so with the blessing of the School District. As noted, they are free to promote candidates in numerous ways in the community and at most polling places throughout the District.

■ There is also uncontroverted deposition testimony that Board members were concerned and annoyed about teachers advocating the election of rival Board candidates. One Board member testified that he found it "objectionable" that "the employees, through a political process, can affect either a change in their employer or the sustenance of an employer, the same employer who is responsible on behalf of the community to engage in bargaining for contracts which affect wages and benefits."[7]

---

5. There is no evidence of any teacher behaving in an overbearing or coercive manner. That a voter feels discomfort when solicited by a teacher does not itself suggest a risk of undue influence. Such voters may well react adversely to the message as well as the presence of a teacher who makes them uncomfortable.

6. Arguably, teachers may be more readily recognized as such by persons voting at a school where their children are enrolled. There is, however, no evidence that those complaining of discomfort had voted at schools which their chil-

dren attend or indeed that all of them had even voted at a school. Moreover, there is nothing to prevent teachers from identifying themselves when they think this would give weight to their opinions or to prevent teachers from communicating at other places with voters whose children attend schools at which they teach.

7. Despite the reference to "sustenance," defense counsel acknowledged at oral argument that Board members receive no compensation.

**464**

A desire to silence voices of opposition is not consistent with the reasons proffered for the Policy and is not a governmental interest which justifies regulation of First Amendment activity. The very essence of free political speech is the right to criticize an existing regime and voice support for alternatives.

A fear that teachers may oppose the re-election of Board members who disagree with them on what constitutes fair compensation was also not proffered as a justification for the Policy and would add little to the balance. There is no evidence that any teacher or union representative ever attempted to leverage contract concessions from board members with promises of political support or threats of opposition. The Board, of course, may take appropriate action in response to any improper acts of coercion or intimidation. It may not, however, restrict the right of teachers to express themselves on matters of public concern.

School Board candidates are presumably subject to countervailing pressures from segments of the community interested in increasing or containing funding for education, maintaining or changing curricula, easing or enhancing academic standards, encouraging or discouraging particular extracurricular activities, adding or removing certain books and an array of other issues. Public officials must often weigh and seek to accommodate a variety of competing views while ultimately exercising their judgment about what is right and best overall for the community. This is part of the democratic process. School Board members may explain to the public why they accepted or rejected particular collective bargaining proposals and criticize contract demands they deem impractical or inappropriate. They may not, however, restrict speech on a matter of public concern because they doubt their own fortitude to withstand the prospect of political opposition from those who may disagree with their priorities.

Moreover, the Policy does not insulate board members from this prospect. Teachers may still organize and advocate the election of candidates in a variety of ways and directly solicit votes at over 80% of the polling places in the District.

Notably, there is nothing in the record to show the occurrence of any event or acquisition by the Board of any new information implicating any of its professed concerns between January 20, 1994 and April 21, 1994. Yet, the initial version of the Policy of January 20th expressly permitted school employees to engage in political activities on their own time at polling places on school property.

The speech restricted by the Policy involves a matter of public concern and implicates fundamental First Amendment interests. Defendants have not presented evidence from which one reasonably may find the presence of governmental interests which outweigh plaintiffs' First Amendment rights to engage during non-working hours in political speech at polling places which happen to be located on school property. Accordingly, the court will enjoin enforcement of the Policy to the extent that it prohibits such activity.

The court notes that in adopting the Policy, the Board appears also to have exceeded its authority under state law. Public school districts have no inherent powers of government. The only powers, functions and duties they possess are those expressly granted by statute or inferred by necessary implication. *Chartiers Valley Joint Schools v. County Bd. of School Directors of Allegheny County,* 418 Pa. 520, 211 A.2d 487, 500 (1965); *Barth v. Philadelphia School Dist.,* 393 Pa. 557, 143 A.2d 909, 911 (1958); *Abington School Dist. v. Yost,* 40 Pa.Cmwlth. 312, 397 A.2d 453, 457 (1979); *School Dist. of Philadelphia v. Framlau Corp.,* 15 Pa. Cmwlth. 621, 328 A.2d 866, 869 (1974). The Public School Code, 24 Pa.S.A. § 1–101 et seq., makes clear that "the Legislature unquestionably intended and provided that the School District could possess and exercise only those powers and functions detailed in the Code." *Barth,* 143 A.2d at 912.

In pertinent part the Public School Code provides:

The board of school directors in any school district may adopt and enforce such reasonable rules and regulations as it may deem necessary and proper regarding the management of its school affairs and the

conduct and deportment of all superintendents, teachers, and other appointees or employes *during the time they are engaged in their duties to the district ...*

24 Pa.S.A. § 5-510 (emphasis added). The plain language of the statute permits a school board to regulate the conduct of employees only during working hours. *See also Monaca School District Appeal,* 52 Pa.D. & C.2d 447, 457 (Beaver Cty.1971). Further, Pennsylvania has legislation specifically addressing political activities by public employees which does not include teachers among those subject to its restrictions. *See* 71 P.S. § 741.905b.

An appropriate order will be entered.

### ORDER

**AND NOW,** this 19th day of July, 1996, upon consideration of plaintiffs' Motion for Summary Judgment (Doc. 8, Part # 1) and defendants' cross-Motion for Summary Judgment (Doc. 10, Part # 1) and after oral argument thereon, consistent with the accompanying memorandum, **IT IS HEREBY ORDERED** that defendants' motion is **DENIED,** plaintiffs' motion is **GRANTED, JUDGMENT is ENTERED** in the above action for plaintiffs and against defendants and accordingly the Colonial School District Policy entitled "Prohibited Political Activities for Employees" is declared to be unconstitutional insofar as it prohibits its employees from engaging in defined political activities at official polling places on school property during non-working hours and defendants, their agents, employees and others acting in concert with them or at their behest are permanently enjoined from enforcement of said Policy insofar as it prohibits such activities at such polling places by School District employees during non-working hours.

Accordingly, the above case is closed.