White v. City of Philadelphia

*M. B. Levitt, S. Lenson, M. J. Matz* and *T. S. Howland,* for plaintiff.

*R. K. Masterson,* Assistant City Solicitor, and *David Berger,* City Solicitor, for defendant.

*G. E. Peterson,* for Philadelphia Housing Authority.

*E. B. Soken* and *C. B. Rhoads,* for school district.

*A. L. Freedman,* for Philadelphia Housing Association, amicus curiae.

ALESSANDRONI, P. J., December 2, 1959. — The Council of the City of Philadelphia by ordinance authorized the Philadelphia Housing Authority, authority hereinafter, to acquire 200 existing, noncontiguous structures and tracts of land for re-use and development in the Haddington area of the City of Philadelphia. This area is bounded by Fifty-second Street, Sixty-third Street, Market Street and Girard Avenue. It appears that pursuant to the authority of the ordinance, the authority will purchase or condemn the properties, repair them and rent them to qualified low income families.

Plaintiffs filed a complaint in equity seeking to have the ordinance declared unconstitutional and to restrain defendants from acting on the authority therein contained. Defendants' preliminary objections attack the complaint on procedural grounds and aver that the complaint fails to state a cause of action. The procedural objections are without merit; consideration is given to the demurrer.

The complaint attacks the power of the city to authorize and the power of the authority to act upon the authorization to acquire noncontiguous structures and tracts in a general area and to thereafter rent them as a low income housing project. The properties so acquired and rented will constitute a "project" scattered throughout an area of approximately 60 square city blocks.

The authority exists by and under the provisions of the Housing Authorities Law of May 28, 1937, P. L. 955, 35 PS §1541 et seq. That act declared that numerous slums and unsafe, unsanitary, inadequate and overcrowded dwellings and the concomitant shortage of decent, safe and sanitary dwellings constituted conditions which were prejudicial to the welfare of the people of the Commonwealth, that private enterprise could not cope with the situation, that clearing slums and relieving the shortage of dwellings would not be competitive with private enterprise, that housing authorities were authorized to: (1) Clear, replace and reconstruct slum areas; (2) provide safe and sanitary dwellings for persons of low income to prevent recurrence of slums, and (3) a combination of (1) and (2). The power to acquire property by eminent domain was conferred and the use of the property so acquired was declared to be for public purposes: Section 2, 35 PS §1542.

The grant of the power of eminent domain, as well as the general constitutional stature of the Housing Authorities Law, supra, has heretofore been chal-

lenged and has been held to be a constitutional exercise of the police power: Dornan v. Philadelphia Housing Authority, 331 Pa. 209. At page 227, the court said: ". . . the eradication of slum areas by the demolition of objectionable dwellings is the dominant background of the Housing Authorities Law." It was further held that to make effective use of the power to clear slum areas it was necessary and proper to grant power to construct new dwellings. The powers were complementary and necessary to accomplish the two-fold objective of the act. The authority is manifestly a creature of the legislature and it therefore has only the powers granted by the enabling statute, specifically or by necessary implication: Barth v. Philadelphia School District, 393 Pa. 557.

The act sets forth, inter alia, the following definitions which are of importance in resolving the issue:

" 'Housing Project' or 'Project.' Any work or undertaking—(1) to demolish, clear or remove buildings from any slum area, or to adapt such area to public purposes, including parks, playgrounds, swimming pools or other recreational or community purposes; or (2) to provide decent, safe, and sanitary urban or rural dwellings, apartments or other living accommodations for persons of low income, such work or undertaking may include buildings, land, equipment, facilities, and other real or personal property for necessary, convenient or desirable appurtenances, streets, sewers, water services, parks, site preparation, gardening, administrative, community, health, recreational, educational, welfare or other purposes; or (3) to accomplish a combination of the foregoing. The term 'Housing Project' or 'Project' may be applied to the planning of the buildings and improvements, the acquisition of property, the demolition of existing structures, the construction, reconstruction, alteration, and repair of existing improvements, and all other work in connection therewith": 35 PS §1543, sec. 3(j).

" 'Slums.' Any area in which there is a predominance of structures which, by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitary facilities, or any combination of these factors, are detrimental to safety, health, and morals": 35 PS §1543, sec. 3 ($q$).

Section 10, 35 PS §1550, enumerates the powers of housing authorities; included, inter alia, are:

"(e) To prepare, carry out, acquire, lease, and operate housing projects, to provide for the construction, reconstruction, improvement, alteration or repair of any housing project, or any part thereof. . .

"(n) To acquire by eminent domain any real property, including improvements and fixtures, for the public purposes set forth in this act, in the manner hereinafter provided.

"(p) To own, hold clear, and improve real property."

Subsection ($p$) of section 3, 35 PS §1543($p$), defines real property: "Lands, lands under water, structures, and any and all easements, franchises and incorporeal hereditaments, and every estate and right therein . . ."

Pursuant to the companion act, Housing Cooperation Law of May 26, 1937, P. L. 888, 35 PS §1581, et seq., the City of Philadelphia entered into a cooperation agreement with the authority. In 1950 the city enacted an ordinance wherein "project" was defined as low-rent housing hereafter developed as one operation which in the aggregate may not exceed 10,000 units of low-rent housing.

In an ordinance enacted October 7, 1958, definition of project was expanded to include acquisition of existing structures not necessarily contiguous located in a general area, for re-use and development by the authority.

The position of defendants is that the Housing Authorities Law, supra, contains ample power to support the "project". It is argued that there is no require-

ment that a project be contiguous. It is conceded that the act does not specifically authorize activity such as herein described. Can authority for this "project" be found in the necessary or appropriate category, that is to say that the act granted power which is necessary or appropriate to effectuate its purposes, and that this particular action falls within the purpose: Section 10, 35 PS §1550. Defendants argue that the power is inherent in the act and that the choice of action is one which lies within the discretion of the authority, and can be upset only upon proof of flagrant abuse of discretion: Blumenschein v. Pittsburgh Housing Authority, 379 Pa. 566.

Since the authority has power to construct and operate "housing projects", is this particular action within the definition of "housing projects"? Blumenschein v. Pittsburgh Housing Authority, supra, is distinguished because in that case there was no selective power to be exercised, except on the overall site. The finding there is inapposite because the selection in this case involves discrimination of 200 properties out of many hundreds of properties.

It is the selective power to be exercised willy-nilly throughout a large area which opens the door to abuses. Power to take property indiscriminately over a large area and replace owner occupants or tenant occupants with families of admitted low-income is a drastic power, not one to be granted lightly. The act is silent on this proposition and in 22 years the legislature has elected to remain silent. As indicated by Justice Stern, the act was sustained as an exercise of the police power because slum clearance was the dominant background. The action here contemplated appears to be separated from that purpose.

But, it is argued, the last sentence of definition $(j)$, supra, refers to construction, reconstruction of existing improvements, and improvements includes buildings; further section 10 $(e)$ empowers the authority to

acquire and operate housing projects and empowers the authority to provide for construction, reconstruction, improvement, alteration or repair of any housing project. The act clearly distinguishes buildings and improvements, i.e., improvements encompasses all facilities ancillary to buildings such as streets, sewers, lights, etc. This intention is further indicated by the amending Act of September 18, 1938, P. L. 34, sec. 4, 35 PS §1574, where "improvements" is again separated from buildings or structures. Also section 23 of the Act of 1937, 35 PS §1563, authorizes a payment in lieu of taxes for "improvements, services and facilities". "Improvements" as used is not the meaning of improvements in the ordinary real estate sense, i.e., any change in land can generically be considered an improvement.

In two instances when the General Assembly intended to grant the power that the authority claims, it was granted specifically: Veterans' Housing Authority Act of July 7, 1947, P. L. 1414, secs. 9 (c) (2) (3) and 9 (d), 35 PS §1590.9; State Board of Housing Law of June 5, 1937, P. L. 1705, sec. 3, 35 PS §1503(5). In that section the definition of housing project included "reconditioning or repair of existing structures". The omission in the Housing Authorities Law, enacted at the same session, supra, assumes greater significance. Since the legislature then specifically granted the power in a statute written 10 years later, it becomes more difficult to imply similar power in a statute 10 years old.

Of additional importance is the legislative finding that public low rent housing will not be competitive with private enterprise. Although this issue cannot be decided upon the present state of the record, it merits consideration. The facts may or may not establish an incompatibility with the legislative finding that public housing will not be competitive with private enterprise.

If this is indeed a "new concept" in public housing as is suggested, it must perforce be grounded upon a legally sufficient base of authority. The legislature has not spoken on the subject for 22 years, except in the negative, i.e., when specific authority was intended it was granted. City council itself recognized a difficulty because it found it necessary to expand its definition of housing project.

At this stage of the proceedings we find that the complaint states a cause of action. Determination of the constitutional and other legal questions must await full development of the facts.

### Order

An now, to wit, December 2, 1959, defendants' preliminary objections are dismissed; defendants are ordered to answer within 20 days of the date hereof.