Pam GIACOMUCCI, Al DiPadova, Robert & Cynthia Frey, Gail McCune, Jay McHugh, Donna Riddagh and Maryann Wojcik

v.

SOUTHEAST DELCO SCHOOL DISTRICT, Board of Directors of the Southeast Delco School District, Edward Barnik, Aaron Cubbage, Joseph Duffy, Mary Carol Flemming, Byron Mundy, Carol Papaleo and John Summers.

Southeast Delco School District, Board of directors of the Southeast Delco School District, Mary Carol Flemming, Byron Mundy, Carol Papaleo and John Summers, Appellants.

Commonwealth Court of Pennsylvania.

Argued May 19, 1999.
Decided Dec. 23, 1999.

Richard D. Komer, Washington, DC, for appellants.

John M. West, Washington, DC, for appellee.

Michael W. Jones, Huntingdon Valley, for amicus curiae.

Before COLINS, President Judge, and DOYLE, J., SMITH, J., PELLEGRINI, J., FRIEDMAN, J., FLAHERTY, J., and LEADBETTER, J.

FRIEDMAN, Judge.

In this appeal, we are asked to decide whether a school district, as a means of stabilizing public school enrollment and controlling future tax increases, may adopt a plan to partially reimburse the tuition of children who attend private schools or non-district public schools. The Court of Common Pleas of Delaware County (trial court) concluded that the Public School Code of 1949 (School Code)[1] prohibits such a plan. We agree.

The uncontested facts giving rise to this controversy are summarized as follows. On March 18, 1998, at a special meeting, the board of school directors for the Southeast Delco School District (School District)[2] adopted the "School Choice Enrollment Stabilization Plan" (Plan[3]) to "provide a tuition scholarship for any student legally residing in the School District who chooses to attend any other public or private school, at which the compulsory attendance requirements of state law may be fulfilled." (R.R. 27a.) The Plan was to "become effective for the 1998–1999 school year with scholarships in the following amounts: Kindergarten—$250.00; Grades 1–8—$500.00; Grades 9–12—$1,000.00." (R.R. 27a.) However, no scholarship would exceed the amount of actual tuition paid. (R.R. 28a.) The School District estimated the first year maximum cost of the Plan to be $1.2 million and expressly provided that "[i]n no event will the total amount expended for such scholarships exceed the amount of state appropriated funds received by the district." (R.R. 27a.) The School District further provided that, in future years, the amounts of the scholarships may be increased in accordance with funds available. (R.R. 28a.) The School District would pay the scholarship money at the end of the school year to the student's parent, after verifying attendance and receiving proof that the tuition was, in fact, paid. (R.R. 28a.) The Plan also provided for reimbursement for a partial year's attendance on a pro rata basis. (R.R. 28a.)

In adopting the Plan, the School District identified the following reasons for the Plan:

Whereas, we believe that parents have a fundamental right to control the education of their children, and that to more fully exercise this right, parents should be given more direct, individual control over their education dollars.

We believe that school choice plays an essential part in improving the quality of education for *all* Southeast Delco students. It will empower parents and help them choose the school that *they* feel is best for their children. The resulting increased competition to attract and keep students will spur school improvement in both the public and private sectors and benefit the entire community.

And whereas, enrollment in our Southeast Delco Public Schools currently is about 4100 students. This is an increase of more than 400 students in the past five years. During this same period of time, the number of Southeast Delco students attending

1. Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1–101 to 27–2702.

2. Our reference to the School District generally includes the individually named directors of the School District's Board of Directors, who are also named as defendants. Where we refer strictly to the school district, it can be gleaned from the context.

3. Although plaintiffs, amicus curiae and the trial court refer to the Plan as "the Voucher Plan," (R.R. 15a *passim;* R.R. 80a *passim* ), we have refrained from using the term "voucher" in connection with the Plan because that term connotes a document issued to parents or students to prepay tuition directly to the school attended. Here, the payment is to be made to parents as reimbursement for tuition previously paid for educational services already rendered. We note, however, that the distinction between a voucher plan and the instant Plan is immaterial with respect to a school district's authority under the School Code.

non-public schools has decreased by more than 300.

Many families in our district are struggling financially, and their children are leaving non-public schools and enrolling in our public schools, which are now filled near capacity. If this trend continues, the financial burden on the taxpayers in our district will be substantial, especially if new school construction is required.

Our district spends about $6,000 to $7,000 for each regular public school student per year. Thus, the Southeast Delco students who currently attend non-public schools, totalling 1,890 as of January 1997, represent a potential unfunded liability of twelve million dollars per year, or more, for local and state taxpayers.

(R.R. 26a–27a.)

On April 16, 1998, prior to the disbursement of any payments under the Plan, plaintiffs, residents and taxpayers [4] of the School District, filed a declaratory judgment action **seeking a declaration that the Plan violated the School Code and, thus, prohibited implementation of the Plan.** (R.R. 9a.) Although the complaint alleged seven causes of action, only two are at issue in this appeal,[5] specifically (1) that the Plan was an *ultra vires* act because it was not "expressly or by necessary implication" authorized by the School Code, and (2) that the Plan constituted an unlawful expenditure of public school funds under sections 610 and 2522 of the School Code.[6]

In its Answer, the School District admitted that its school board had established the Plan on March 18, 1998, and that the resolution adopting the Plan was attached to the complaint. (R.R. 15a ¶ 8; R.R. 58a ¶ 8.) The School District, however, denied that it lacked authority to make reimbursements for tuition of children not attending public schools within the School District. (R.R. 58a–63a.)

On July 28, 1998, plaintiffs filed a motion for judgment on the pleadings limited to its first two causes of action, i.e., that the

4. Five of the plaintiffs are also parents of children attending, or planning to attend, public schools in the School District. All of the plaintiffs pay taxes to both the School District and the Commonwealth of Pennsylvania.

5. The other five causes of action were: (1) The Plan violated Art. III, § 15 of the Pennsylvania Constitution, which provides that "[n]o money raised for the support of the public schools of the Commonwealth shall be appropriated to or used for the support of any sectarian school"; (2) the Plan violated Art. I, § 3 of the Pennsylvania Constitution, which provides that no person may "be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent"; (3) the Plan violated Art. III, § 29 of the Pennsylvania Constitution, which provides that "[n]o appropriation shall be made for charitable, educational or benevolent purposes to any person or community nor to any denominational and sectarian institution, corporation or association"; (4) the Plan violated Art. 3, § 30 of the Pennsylvania Constitution, which provides that "[n]o appropriation shall be made to any charitable or educational institution not under the absolute control of the Commonwealth ... except by a vote of two-thirds of all members elected to each House";

and (5) the Plan violated Art. 9, § 9 of the Pennsylvania Constitution, which provides that the "General Assembly shall not authorize any municipality or incorporated district ... to obtain or appropriate money for ... any corporation, association, institution or individual."

6. The complaint alleged that the School District's expenditure of funds for the Plan violated sections 610 and 2522 of the School Code, 24 P.S. §§ 6–610 and 25–2522. (R.R. 19a.) Section 610 states that "[t]he use or payment of any public school funds of any school district, in any manner for any purpose not provided in the [School Code], shall be illegal." Section 2522 states that "[t]he annual State appropriation apportioned and distributed ... to any school district ... shall be used by the district through its board of school directors for the use of the district for the purposes mentioned in [the School Code]...." Because here there was no evidence that the tuition reimbursements were to be made with state appropriations rather than with the School District's local tax revenue, we do not address section 2522 of the School Code.

School District lacked authority under the School Code to implement the Plan. In response, the School District and the Pennsylvania School Boards Association (PSBA), in the capacity of amicus curiae, argued that, not only did the School District have express authority under the School Code to adopt the Plan,[7] but that, when read in context with the Pennsylvania Constitution's requirement of providing a thorough and efficient system of public education, it had implied authority under the School Code to do so. By decision of October 14, 1998, the trial court disagreed and granted judgment on the pleadings in favor of plaintiffs. (R.R. 80a–90a.) In so ruling, the trial court restricted its inquiry to the School Code, explaining that the constitutional provisions relied on by the School District were not relevant. (R.R. 85a.) As a result, the trial court enjoined the School District "from implementing and enforcing any and all provisions" of the Plan. (R.R. 78a–79a.) The School District's appeal followed.

### I

■ On appeal,[8] the School District and PSBA initially argue that the General Assembly's constitutional responsibility to provide a thorough and efficient system of public education gives the School District implied authority under the School Code to implement the Plan. They contend that the trial court erred because it did not consider that constitutional mandate when it determined that the School District lacked authority under the School Code to adopt the Plan. (School District's brief at 10.) We disagree.

■ Article 3, § 14 of the Pennsylvania Constitution states: "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." The General Assembly has carried out that constitutional responsibility through enactment of the School Code. *Minsinger v. Rau*, 236 Pa. 327, 84 A. 902 (1912). In section 211 of the School Code, 24 P.S. § 2–211, the General Assembly created local school districts and delegated to them "all necessary powers to enable them to carry out the provisions of" the School Code.

The School District and PSBA contend that, because the General Assembly, in order to meet its constitutional responsibility, delegated broad powers to school districts in the School Code, we should necessarily conclude that the School Code authorized the Plan. In support of that contention, they rely on *School District of Wilkinsburg v. Wilkinsburg Education Ass'n.*, 542 Pa. 335, 667 A.2d 5 (1995) and *School District of Philadelphia v. Twer*, 498 Pa. 429, 447 A.2d 222 (1982), for the proposition that the School Code, when read in light of the General Assembly's constitutional responsibility of providing a thorough and efficient system of public education, authorizes a school district's action even where that action is not expressly, or by necessary implication, authorized by the School Code. These cases do not compel such a conclusion. Indeed, after

---

7. In this appeal, the School District and PSBA have abandoned the argument the School Code provided express authority for the Plan. (School District's brief at 11; PSBA's brief at 13.)

8. In an appeal from a decision granting judgment on the pleadings, our scope of review is limited to determining whether the trial court committed an error of law or abused its discretion. *Smith and McMaster, P.C., v. Newtown Borough*, 669 A.2d 452 (Pa.Cmwlth. 1995). When reviewing a trial court's deci-

sion to grant a motion for judgment on the pleadings, we may consider only the pleadings, accepting as true all well pleaded statements of fact, admissions and any documents properly attached to the pleadings presented by the party against whom the motion is filed. *Bradley v. Franklin County Prison*, 674 A.2d 363 (Pa.Cmwlth.1996). We may sustain the trial court's grant of judgment on the pleadings only where the movant's right to succeed is certain and the case is so free from doubt that trial would be a fruitless exercise. *Id.*

careful analysis, we conclude that those cases are inapplicable here.

In *Wilkinsburg* and *Twer*, our supreme court held that, where a school board demonstrates that it cannot provide a thorough and efficient education within the confines of the School Code, then it might be appropriate to over-ride the School Code. Here, the School District sedulously points out that it is **not** arguing that the constitutional responsibility of providing a thorough and efficient system of education permits it to over-ride the School Code. (School District's brief at 15.) In *Wilkinsburg*, our supreme court specifically pointed out that it did not reach the argument presented by the School District here—that the School Code authorized the school board's action. Because the School District has not taken the position that, if the School Code does not authorize its Plan, then the School Code is unconstitutional, neither *Wilkinsburg* or *Twer* is relevant, and the trial court did not err in restricting its inquiry to the School Code.

## II

We now consider the School District's and PSBA's contention that the School Code provides implicit authority for the Plan. The School District specifically relies on the policy of local control reflected in the School Code as conferring authority for the Plan. (School District's brief at 10.)

PSBA asserts that the General Assembly's broad grant of authority to school districts in section 501 of the School Code, 24 P.S. § 5–501, gives the School District implied authority for its Plan.[9] (*See* PSBA's brief at 15.)

 PSBA and the School District concede, as they must, that a school district is a creature of the legislature and therefore has no power **"except by express statutory grant and necessary implication."** (School District's brief at 11–12 (emphasis added), relying on *Mulligan v. School District of Hanover Township*, 241 Pa. 204, 207, 88 A. 362, 362 (1913); PSBA's brief at 12.) Because a school district is "the administrative arm of the legislature, its authority springs only from legislative enactments." *Petition of James Granat*, 139 Pa.Cmwlth. 376, 590 A.2d 849, 852 (1991). Here, because the School Code does not expressly authorize the reimbursement of tuition fees, the School District may implement the Plan only if the School Code provided the School District authority by "necessary implication" to do so.

The School District and PSBA direct this court to numerous cases where courts held that a school district had implied authority to take an action that was not expressly provided for in the School Code.[10] However, in each of those cases, the court relied upon an express grant of school district to take actions not expressly or, by necessary implication, authorized elsewhere in the School Code.

9. PSBA also relies on sections 211, 301 and 508 of the School Code as support for the School District's implied authority to implement the Plan. However, none of those sections permits the Plan. Section 211 of the School Code, 24 P.S. § 2–211, provides: "The several school districts in this Commonwealth shall be, and hereby are vested as bodies corporate, with all necessary powers to enable them to carry out the provisions of [the School Code]." Section 301 of the School Code, 24 P.S. § 3–301, provides that "[t]he public school system of the Commonwealth shall be administered by a board of school directors, to be elected or appointed, as hereinafter provided." It goes on to describe how school directors are to be elected. Section 508, 24 P.S. § 5–508, delineates actions requiring a majority vote of the school directors. None of those sections empower a

10. PSBA also cites *Steirer by Steirer v. Bethlehem Area School District*, 987 F.2d 989 (3d Cir.), *cert. denied*, 510 U.S. 824, 114 S.Ct. 85, 126 L.Ed.2d 53 (1993), for this proposition, stating that, despite a lack of express authority in the School Code, school districts impose a mandatory graduation requirement that students perform community service. (*See* PSBA's brief at 17.) However, the plaintiffs in that case did not challenge the school board's authority under the School Code; rather, they argued, unsuccessfully, that the graduation requirement violated the first, thirteenth and fourteenth amendments of the United States Constitution.

authority in the School Code that, in turn, by necessary implication, gave the school district authority to take an action not expressly authorized. For instance, in *Parents United for Better Schools, Inc. v. School District of Philadelphia*, 148 F.3d 260 (3d Cir.1998), the court found that a school district had authority under the School Code to implement a consensual program to distribute condoms in public schools in order to prevent disease. The court based this determination on the School Code's express authorization for school boards: (1) to enter into agreements that, in the opinion of the board, would further the efficient and effective administration of public education; (2) to institute cooperative programs to address health services; and (3) to develop a curriculum designed to teach students good personal health habits including disease prevention and specifically HIV and AIDS prevention.

Similarly, in *Moriarta v. State College Area School District*, 144 Pa.Cmwlth. 359, 601 A.2d 872 (1992), we ratified a school board's use of term contracts for athletic coaches, despite the School Code's lack of specific authority for such contracts, because the School Code expressly authorized school boards to manage athletics and employ persons in connection with extracurricular activities.

■ Here, PSBA contends that § 501 of the School Code is the express grant of authority in the School Code that, by necessary implication, gives the school district authority for the Plan. Section 501 of the School Code, 24 P.S. § 5–501, expressly directs school districts to "establish, equip, furnish, and maintain a sufficient number of elementary public schools [and] to edu-

cate" each of its residents between the ages of six and twenty-one years of age. Clearly this section authorizes school districts to spend money to build, maintain and equip schools and to educate public school children. It is, however, far too great a leap of logic to conclude that, through section 501, the General Assembly also intended school districts to provide financial incentives to students choosing not to attend its schools, i.e. to spend money so that in the future it would **not** need to build and maintain additional schools and **not** need to educate additional schoolchildren.[11]

The School District and PSBA further argue that school districts have implicit authority to take actions not expressly prohibited by the School Code. (*See* PSBA's brief at 15.) In support of that argument, they rely on cases such as *Pennsylvania State Educ. Ass'n. v. Baldwin Whitehall School District*, 30 Pa.Cmwlth. 149, 372 A.2d 960 (1977) and *Rike v. Com., Secretary of Education*, 508 Pa. 190, 494 A.2d 1388 (1985). We disagree that those cases stand for that proposition.

In *Pennsylvania State Educ. Ass'n*, we noted that the School Code did not expressly prohibit the school district's providing its teachers a retirement allowance based on unused accumulated sick days as part of its collective bargaining agreement. However, we did not base our holding on the lack of prohibition; rather we determined that specific authority existed for the expenditure "as a necessary implication of the interaction between the Public School Code of 1949 and the Public Employe Relations Act." *Id.*, 372 A.2d at 962. Indeed, we ruled that the Public **Employe** Relations Act[12] required the school district to bargain collectively with its employees.

11. Under this view of a school district's implicit authority under section 501, 24 P.S. § 5–501, there is no end to the ideas a school district could employ as a means of controlling or reducing the future student population in order to provide an education in the best interests of their students. For example, would section 501 implicitly authorize a school district to pay for birth control for its

residents, to offer financial incentives for home-schooling, to give its residents with school-aged children a cash incentive or rebate to move out of the district, or to impose a tax on new residents with minor children to discourage them from moving into the district?

12. Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.201–.2301.

Similarly, in *Rike,* our supreme court noted the School Code's total silence with respect to protections to be afforded to tenured teachers prior to imposition of any discipline short of dismissal. However, our supreme court's decision that school boards had inherent authority to take lesser disciplinary actions was not based solely on the School Code's silence, but rather on the School Code's silence in conjunction with the board's inherent authority to take such actions found in other sections of the School Code.[13] In sum, the cases relied upon by PSBA and the School District do not dispense with the requirement that the School District must point to some provision in the School Code which, by necessary implication, permits the Plan.

Additionally, like the school board in *Barth v. School District of Philadelphia,* 393 Pa. 557, 143 A.2d 909 (1958),[14] here the School District relies on the fundamental policy, as expressed in the Constitution and underlying the School Code, to consider the best interests of the students. We are keenly aware that "(t)he polestar in any decision requiring the assignment of priorities of resources available for education must be the best interest of the student." *Twer,* 498 Pa. at 435, 447 A.2d at 224. However, as our supreme court concluded with respect to the school board in *Barth,* we also conclude that a consideration of the best interests of students does not aid the School District here, because "a very worthy objective does not justify the action of a . . . public school district, . . . unless that action is authorized by the Constitution or expressly or by necessary implication by an Act of the Legislature." *Barth,* 393 Pa. at 565, 143 A.2d at 913 (footnote omitted).

The School District asks us not to view the School Code as to "necessarily imply a straitjacket that a school district must wear, powerless to affect the current enrollment trend as it continues inexorably to its inevitable conclusion: a public school monopoly where private schools are a practicable alternative for only a small number of well-to-do residents of the district." (School District's brief at 18–19.) Although we sympathize with the dilemma faced by the School District, as well as many other school districts, we are constrained to agree with the trial court that the School District's good faith and laudable motives in adopting the Plan as a means of managing its tax dollars do not save the Plan. Despite its apparent tax benefits, the fact remains that the School District's Plan to subsidize the education of schoolchildren choosing to attend nondistrict schools through partial tuition reimbursement is not authorized, expressly or impliedly, by the School Code.

### III

Having dispensed with the School District's and PSBA's arguments that the School Code implicitly permits the Plan, we now examine the School Code for further evidence of the General Assembly's intent regarding school districts' authority to reimburse tuition of students not at-

13. In *Rike,* a suspended teacher argued that the school board lacked authority to impose any discipline short of dismissal and that the two-thirds vote required for dismissal was required for all forms of discipline. Disagreeing, our supreme court interpreted the School Code's silence regarding discipline short of dismissal as an indication that the legislature did not intend to require the same procedures for lesser disciplinary actions as it did for dismissals. That is, however, not the same as permitting *school boards to take any action* upon which the School Code is silent. Rather, in *Rike,* the court relied upon sections of the School Code empowering school boards to employ teachers and regulate their conduct as inherent authority for the board's action where the School Code was otherwise silent. That court reasoned, "The power to regulate conduct, of course, would be illusory absent a concomitant power to enforce rules through the imposition of some form of discipline." *Id.* at 195, 494 A.2d at 1391.

14. In *Barth,* the court held that a school board lacked authority under the School Code to spend funds to respond to the local problem of juvenile delinquency.

tending its schools. Based on our examination, we conclude that the General Assembly did not intend to permit school districts to implement tuition reimbursement plans. We offer six reasons to support our conclusion.

First, the General Assembly has devised a complex and elaborate formula by which school districts receive funding from the state. That formula takes into account differences among school districts. For example, it takes into account each district's market value and income ratio. *See, e.g.,* § 2502.35 of the School Code, 24 P.S. § 25–2502.35. It also takes into account increases in student population by providing for a "growth supplement," and it provides for a "poverty supplement" for children of low-income families. *Id.*

Second, although the General Assembly has charged school districts with the "duty of securing, managing, and spending the necessary funds in the interest of public education," *Slippery Rock Area Joint School System v. Franklin Township School District,* 389 Pa. 435, 442, 133 A.2d 848, 852 (1957), the School Code envisions that, in addition to the state appropriation and federal funding,[15] the only source of revenue available to a district is the power to levy and collect taxes. Section 507 of the School Code provides in pertinent part:

> In order to establish, enlarge, equip, furnish, operate, and maintain any schools or departments herein provided, or to pay any school indebtedness which any school district is required to pay, or to pay any indebtedness that may at any time hereafter be created by any school district, or to enable it to carry out any provisions of this act, the board of school directors in each school district is hereby vested with all the necessary authority and power annually to levy and collect, in the manner herein provided, the necessary taxes required, in addition to the annual State appropriation, and shall have, and be vested with, all necessary power and authority to comply with and carry out any or all of the provisions of this act.

24 P.S. § 5–507.

In *Abington School District v. Yost,* 40 Pa.Cmwlth. 312, 397 A.2d 453 (1979), we refused to find implicit authority in the School Code for school districts attempting to improve on the system of school financing chosen by the General Assembly. There, we concluded that the School Code did not authorize a school district to reduce the salaries of its tax collectors. We explained, "There is not the slightest indication that the Legislature intended that local taxing authorities should have the power to reduce compensation as a means of reforming to their satisfaction the system of local tax collections, already comprehensively provided for in the statutes." *Id.* at 456–57. We added, "There may be something to be said for [the system adopted by the school district] on ground of economy and possibly efficiency; there may also be something to be said for the traditional separation at the local level of the functions of levying and collecting taxes. The choice of system, however, is that of the Legislature, not School Boards." *Id.* at 457. Similarly, here, we do not condemn the efficiency or expediency of the School District's Plan; however, the use of such a plan as a means of fiscal economy is a choice that belongs to the General Assembly, not individual school districts.

We also point out that, under the "thorough and efficient" clause of the Pennsylvania Constitution, a school district "has no greater duty to provide education for the children [in its district] than the Legislature has delegated to it. It would be unreasonable to conclude that a greater duty has been delegated than that which the Legislature, through the statutory funding scheme, has provided the school district the means to fulfill." *Danson v.*

---

15. In *Danson v. Casey,* 484 Pa. 415, 421 n. 5, 399 A.2d 360, 363 n. 5 (1979), our supreme court noted that federal funding constitutes an "important source of revenue for Pennsylvania school districts."

*Casey,* 484 Pa. 415, 424, 399 A.2d 360, 365 (1979). (Citation omitted.) This is not to say that a school district is powerless where the means by which the General Assembly has authorized it to raise money to fund education are inadequate. In cases where a school district proves that its funding is inadequate to provide for a thorough and effective system of public education, courts may order the Commonwealth to fulfill its constitutional responsibility by providing additional resources to the school district.

■ Third, in furtherance of fulfilling its constitutional responsibility of providing for a thorough and efficient system of public education, the General Assembly, in the School Code, has set out procedures where the Secretary of Education may take action upon determining that a school district is in financial distress. *See* sections 691–695 of the School Code, 24 P.S. §§ 6–691–6–695.[16] Indeed, where a school district operates in a financially over-burdened area with a disproportionately high tax burden so that it is unable to rely on its local tax base to generate sufficient funding to provide an adequate education to its students, the appropriate remedy may be a declaration that the district is "financially distressed." *See Marrero by Tabales v. Commonwealth,* 709 A.2d 956, 957 (Pa.Cmwlth.1998) (Colins, J., concurring.) *See, e.g., Pennsylvania Labor Relations Board v. General Braddock Area School District,* 33 Pa.Cmwlth. 55, 380 A.2d 946 (1977) and *Brownsville Area School District v. Lucostic,* 6 Pa.Cmwlth. 587, 297 A.2d 516 (1972) (declaring school districts financially distressed). That the General Assembly has considered the difficulties faced by financially distressed school districts and has specifically attempted to respond to them in the School Code indicates that the General Assembly did not intend to authorize individual school districts to resort to tuition reimbursement plans to avoid tax increases.

Fourth, in the School Code, the General Assembly generally is clear when it grants school districts authority to spend money. For example, the School Code explicitly authorizes school districts to expend funds for the erection or maintenance of traffic control devices, section 526 of the School Code, 24 P.S. § 5–526; for the purchase of land and buildings for its schools, section 703 of the School code, 24 P.S. § 7–703; and for construction and reconstruction of its school buildings. Section 2574 of the School Code, 24 P.S. § 25–2574. Likewise, a school district has express authority to expend funds to lease facilities, section 731.1 of the School Code, 24 P.S. § 7–731.1; to purchase residences for its principals, teachers or janitors, section 705 of the School Code, 24 P.S. § 7–705; to equip "playgrounds, playfields, gymnasiums, public baths, swimming pools, and indoor recreation centers …," section 706 of the School Code, 24 P.S. § 7–706 and to pay police officers appointed pursuant to section 778 of the School Code, 24 P.S. § 7–778. A school district is also authorized to purchase "all necessary furniture, equipment, textbooks, school supplies and other appliances for the use of the public schools, or any department thereof…." Section 801 of the School Code, 24 P.S. § 8–801. The fact that the School Code does not expressly authorize school districts to reimburse the tuition of students not attending district schools is a further indication

---

**16.** When a school district is declared financially distressed by the Secretary of Education, following proper investigation of the district's financial condition, under section 691 of the School Code, 24 P.S. § 6–691, section 692 of the School Code, 24 P.S. § 6–692, provides for court-appointment of a special board of control to "assume control of the affairs of the district and operate it in the place of the school directors during the period necessary to reestablish a sound financial structure in the district." Section 693 of the School Code, 24 P.S. § 6–693, sets out the powers of the special board of control. One of the designated powers is to "increase tax levies…." Section 693(2) of the School Code, 24 P.S. § 6–693(2). Also, section 694 of the School Code, 24 P.S. § 6–694, authorizes the special board of control to require school directors to levy additional taxes in excess of tax limitations otherwise imposed by law.

of the General Assembly's intent not to invest school districts with such power.

Fifth, in the School Code, the General Assembly has specified circumstances where a school district may pay the tuition for its students who do not attend district schools.[17] For example, the School Code permits school districts to pay the tuition of its students who attend certain nondistrict public schools for convenience where the district does not offer free transportation to a district school. (*See* sections 1313, 1315, 1607, 1609, 1809 of the School Code, 24 P.S. §§ 13–1313, 13–1315, 16–1607, 16–1609, 18–1809.) Likewise, the School Code provides for school districts to pay private school tuition for its students who are deaf, blind, socially and emotionally disturbed or who are afflicted with cerebral palsy, brain damage, muscular dystrophy or mental retardation. Section 1376 of the School Code, 24 P.S. § 13–1376. It also provides for tuition payments for exceptional students. Section 1372 of the School Code, 24 P.S. § 13–1372. The General assembly also has directed school districts to pay tuition of charter school students. Section 1725–A(a)(2) of the School Code, 24 P.S. § 17–1725–A(a)(2). In light of the many provisions authorizing school districts to pay the tuition of its students attending nondistrict schools, the School Code's failure to authorize school districts to reimburse tuition directly to parents in the situation presented here evidences an intent not to permit such expenditures.

Sixth, the General Assembly considered the concerns of the School District and addressed those concerns by enacting the Parent Reimbursement Act for Nonpublic Education (Act), Act of August 27, 1971, P.L. 358, 24 P.S. §§ 5701–5710. In that Act, the General Assembly, through its legislative finding and declaration of policy, recognized and agreed with the identical concerns raised by the School District here.[18] That Act created a parent reim-

---

17. Here, the School Code's provision of express authority to school districts to pay the tuition of students not attending district schools in certain situations reveals a "clear expression of legislative intent," *Rike*, 508 Pa. at 196, 494 A.2d at 1391, of the situations in which a school district is permitted to pay tuition of students not attending its schools. Unlike *Rike*, this is not a situation where the School Code is "totally silent." *Id.*

18. Section 2 of the Act provides:

It is hereby determined and declared as a matter of legislative finding:

(1) That parents who send their children to nonpublic schools assist the State in reducing the rising costs of public education.

(2) The welfare of the Commonwealth requires that this and future generations of school age children be assured ample opportunity to develop to the fullest their intellectual capacities. To further this objective the Commonwealth has had in force for many years a compulsory school attendance law.

(3) In the exercise of their constitutional right to choose nonpublic education for their children, parents who support such education make a major contribution to the public welfare. However, the immense impacts of inflation, plus sharply rising costs of education, now combine to place in jeop-

ardy the ability of such parents to carry this burden.

(4) Should parents of children now enrolled in nonpublic schools be forced by economic circumstances to transfer any substantial number of their children to public schools, an enormous added financial, educational and administrative burden would be placed upon the public schools and upon the taxpayers of the State. Without allowance for inflationary increase, the annual operating cost of educating in public schools, the five hundred thousand students now enrolled in Pennsylvania's nonpublic schools would be an additional four hundred million dollars ($400,000,000). Necessarily added capital costs to construct new facilities or acquire existing facilities would be in excess of one billion dollars ($1,000,000,000). Any substantial portion of these operating and capital costs would be an intolerable public burden and present standards of public education would be seriously jeopardized. Therefore, parents who maintain students in nonpublic schools provide a vital service to the Commonwealth. Wherefore, it is declared to be the public policy of the Commonwealth:

That, in order to reimburse parents partially for this service so vitally needed by the Commonwealth, and in order to foster educational opportunity for all children, a pro-

bursement fund financed by a tax on cigarettes. Section 5 of the Act, 24 P.S. § 5705. The conditions for parental reimbursement were substantially similar to those of the School District's Plan. *See* section 6 of the Act, 24 P.S. § 5706. Like the School District's Plan, the Act provided for tuition reimbursements for elementary and high school students, with the reimbursement for high school students twice that provided for elementary students. *See* section 7 of the Act, 24 P.S. § 5707 (providing for a maximum tuition reimbursement of $75 for elementary school students and $150 for secondary students). Although the United States Supreme Court, in 1973, declared that Act unconstitutional,[19] [*See Sloan v. Lemon,* 413 U.S. 825, 93 S.Ct. 2982, 37 L.Ed.2d 939 (1973) ], by enacting it, the General Assembly formally acknowledged that the concerns raised by the School District in its Plan are not peculiar to a single school district,[20] but are statewide concerns properly addressed by the General Assembly.[21] Also, the fact that the General Assembly expressly addressed these concerns on a statewide basis underscores the lack of

implied authority in the School Code for the School District's Plan.

Since the Parent Reimbursement Act for Nonpublic Education was declared unconstitutional twenty-six years ago, the General Assembly has chosen not to address these concerns. Thus, we conclude that the School District's Plan, seeking to accomplish on a local scale what the General Assembly attempted but failed to accomplish on a statewide scale, is not authorized by the School Code.

## IV

 We are mindful that "[j]udicial interference with a school board's performance of its discretionary duties can only be sustained where it is clearly shown that the school board acted outside the scope of its statutory authority or in bad faith." *Zebra v. School District of City of Pittsburgh,* 449 Pa. 432, 440–41, 296 A.2d 748, 752 (1972). However, unlike the situation in *Zebra,* where the court refused to interfere with a school board's discretionary function of pupil assignment, here the School District's Plan was not authorized

gram of Parent Reimbursement for Nonpublic Education is hereby established. 24 P.S. § 5702.

**19.** That Court found that the Act had the impermissible effect of advancing religion in violation of the Establishment Clause of the First Amendment.

**20.** We note that taxpayer rancor in response to the increasing burden of taxes for public education is not a new phenomenon or limited to the School District. Indeed, in 1937, our supreme court acknowledged the extensive criticism voiced by taxpayers throughout the state in response to increased school taxes. *See Wilson v. School District of Philadelphia,* 328 Pa. 225, 195 A. 90 (1937).

**21.** The School District points out that, in *Rhoades v. School District of Abington Township,* 424 Pa. 202, 226 A.2d 53, *appeal dismissed,* 389 U.S. 11, 88 S.Ct. 61, 19 L.Ed.2d 7 (1967), our supreme court recognized that all schoolchildren are the concern of the School Code and that taxpayers are financially bene-

fited by the existence of nonpublic schools. (School District's brief at 21–23.) Because its Plan resulted from an identical concern, the School District argues that its Plan is justified. However, the School District overlooks the fact that in *Rhoades* our supreme court considered those concerns in the context of upholding the constitutionality of our General Assembly's amendment of the School Code to provide for free transportation for nonpublic school children. Significantly, the court did not find that the School Code, absent amendment, would have authorized school districts to furnish the free transportation. Indeed, in, cases decided prior to the General Assembly's amendment of the School Code authorizing school boards to provide free transportation, our supreme court ruled that school boards lacked authority to furnish free transportation to nonpublic school children. *See School District of Robinson Township v. Houghton,* 387 Pa. 236, 128 A.2d 58 (1956) (dictum) and *Connell v. Board of School Directors of Kennett Township,* 356 Pa. 585, 52 A.2d 645, *appeal dismissed,* 332 U.S. 748, 68 S.Ct. 26, 92 L.Ed. 335 (1947).

by the School Code and, therefore, was not a discretionary duty.

## V

 Finally, relying on *Wilkinsburg,* PSBA argues that the trial court erred in not allowing the School District to develop a factual record to determine whether the Plan will, in fact, reduce operating costs by stabilizing enrollment and reducing the need for expensive school construction. (PSBA's brief at 14.) PSBA thus asks us to remand this case for development of a factual record. (PSBA's brief at 14.) Because this case does not involve a preliminary injunction, as did *Wilkinsburg,*[22] we disagree that a remand is required so that the School District can develop a factual record.

Moreover, the School District did not request a hearing at all.[23] Instead, it conceded that the case involved "pure questions of law, and may be resolved on the basis of the pleadings as they now stand." (School District's Memorandum in Opposition to Plaintiff's Motion for Judgment on the Pleadings at 2.) We agree with the School District that the matter was appropriate for resolution on the pleadings; thus, the trial court did not err in not conducting an evidentiary hearing.

## VI

Accordingly, we conclude that the School District clearly acted outside the scope of its statutory authority in adopting the Plan. Because the "use or payment of any public school funds of any school district, in any manner or for any purpose not provided in" the School Code is illegal, section 610 of the School Code, 24 P.S. § 6–610, we affirm the decision of the trial court to enjoin the School District from implementing or enforcing the Plan.[24]

Judge PELLEGRINI concurs in the result only.

Judge FLAHERTY concurs in the result only.

## *O R D E R*

AND NOW, this 23rd day of December, 1999, the order of the Delaware County Court of Common Pleas dated October 14, 1998 is hereby affirmed.

**22.** In *Wilkinsburg,* our supreme court ruled that the trial court erred when it refused to hold an evidentiary hearing before granting a preliminary injunction enjoining a school board from hiring a private corporation to run an elementary school. In remanding the case for an evidentiary hearing, our supreme court explained that no preliminary injunction may be granted without a hearing because a hearing is essential to determine whether the requirements for a preliminary injunction have been met. The standard of review in that case was the one applicable to review of preliminary injunctions—whether the trial court had reasonable grounds to believe that it was presented with a situation of urgent necessity when it issued the preliminary injunction. It is important to note that the nature of a preliminary injunction is that it is almost always decided by the trial court **before** the defendant has an opportunity to file an answer to the complaint. Indeed, in

*Wilkinsburg,* the trial court issued the preliminary injunction the day after the complaint in equity and motion for preliminary injunction were filed. Here, in sharp contrast, we are not presented with the issuance of a preliminary injunction, but a decision granting judgment on the pleadings nearly six months after the complaint was filed, after the School District filed an answer with new matter and after all parties, including amicus curiae, filed briefs.

**23.** Only PSBA as amicus, not the School District, asks us to remand the case for the development of an evidentiary record.

**24.** We are careful to point out that our decision is limited to determining a school district's authority to adopt a tuition reimbursement or voucher plan. We have not been presented with, nor do we decide, the issue of whether such plans comport with other laws.